THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
ARTHUR KING, Defendant-Appellant.

First District (1st Division)   No. 1—88—3467

Opinion filed April 20, 1992.

Randolph N. Stone, Public Defender, of Chicago (Stephen L. Richards, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Brian Clauss, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE BUCKLEY delivered the opinion of the court:

Defendant Arthur King, along with Dwayne Cheers, was charged with armed robbery. The cases were severed. Dwayne Cheers pled guilty after agreeing with the State to a plea bargain. After a jury

trial, defendant was found guilty of armed robbery and sentenced to 12 years' imprisonment.

At defendant's trial, Gwendolyn Harris testified that on the evening of September 20, 1987, she was wearing eight silver chains, seven silver rings and one gold ring. As Harris approached the building at 511 East Browning, she saw a short male dressed in blue and a taller male with braided hair, dressed in a white jacket and white hat. Harris entered the building, went to the second floor and purchased some marijuana. When Harris came down the stairs, she was confronted by the short male, who asked whether there was marijuana for sale on the second floor. Harris responded that there was. The tall male, whom Harris identified in a lineup and in court as defendant, was blocking the exit. Harris testified that defendant pointed a gun at her and said, "Bitch, don't say a word before I shoot you." Defendant began to remove Harris' jewelry, while the short male, whom Harris identified as Cheers, rummaged through her purse. Defendant removed two chains from Harris' neck, and Harris removed the remaining six. Harris also removed her rings and handed them to defendant. Defendant ordered Cheers to search Harris. Cheers searched Harris' pockets and bra. Cheers removed $50 and two bags of marijuana. Defendant then ordered Cheers to "go get the car."

After collecting her belongings, Harris went to the back of the hallway, where she overheard one of the men say, "I told you that was the bitch to get." Harris testified that the hallway where she was robbed was lit and she saw the faces of the two men. Harris went to the Lake Meadow Shopping Center and told a security guard what had happened. After the police arrived, Harris gave them a description of the men and drove around the area with them in an attempt to find them.

On October 1, 1987, Harris contacted Detective Edward Kevin. Harris informed Kevin that her friend, a woman named Mary Porter, who lived at 511 East Browning, apartment 404, was wearing her stolen jewelry. Harris also told Kevin that Porter had a boyfriend called "Coon." On October 3, Kevin along with Detectives Haviat, Grady and O'Connell went to the apartment. Kevin identified himself as a police officer, and a man opened the door. The man told Kevin his name was Coon. Kevin identified defendant in court as the man who opened the door and claimed to be Coon. Defendant allowed the officers into the apartment. The officers placed defendant under arrest. Kevin informed Porter that it was reported that she was seen wearing the stolen jewelry. Porter gave Kevin a plastic container in

which there were various pieces of jewelry. The jewelry matched the description of the stolen jewelry.

On October 3 and 4, Harris went to the police station and viewed two separate lineups. Harris identified defendant during the October 4 lineup and Cheers at the October 3 lineup. Harris also identified various pieces of jewelry as being her property.

Kevin was also called to testify on behalf of defendant to discrepancies in Harris' testimony. Kevin testified that Harris had told him that it was Cheers that blocked the exit, not defendant. Additionally, Harris originally told Kevin that she removed the first two chains herself and that defendant removed the rest of the chains.

Next, Porter testified that the police searched for the stolen jewelry while they were in her apartment. Porter testified that she purchased the jewelry for $10 from Cheers the previous day. Porter denied telling Kevin that on September 20, 1987, defendant and Cheers came to her apartment with the silver chains and rings, which they examined on the kitchen table. Porter further denied telling Kevin that some of the jewelry was still in the apartment. Porter testified that she visited defendant numerous times in jail, while he was awaiting trial, and that she did not want anything to happen to him.

Defendant attempted to call Cheers as a witness on his behalf. Before trial, Cheers pled guilty to armed robbery in exchange for an eight-year sentence to the Illinois State penitentiary. At the time that Cheers entered his plea, the State read certain facts into the record. A pertinent part of the facts read into the record was that Harris "would testify that the defendant Cheers blocked her path and began to talk to her, which time a codefendant, Arthur King, approached from the rear, placed the revolver against her right temple which time Dwayne Cheers began to physically search Miss Harris' person." Cheers' attorney stipulated to the above facts. After the stipulation, the State commented that defendant's case had yet to be resolved, and that "[i]n regard to Mr. Cheers, albeit that there's been no amendment to the defendant's answer regarding defendant Cheers being called on behalf of him—." The trial judge entered judgment on the conviction, but withheld sentencing at the request of the State. The judge explained to Cheers that withholding sentencing was "just a tactical move." Cheers responded to the court, "Yes, sir, but that would make me, me and Arthur King, we ain't connected with nothing." The court responded, "Well, I understand that, but I just want to, so that the State doesn't have that fear."

During defendant's trial, but prior to Cheers' sentencing, defendant attempted to call Cheers as a witness on his behalf. Before Cheers

could testify, Mr. Helis, Cheers' attorney, represented to the court that he had advised his client not to talk with the prosecution or defendant's attorney and not to testify at defendant's trial. The record contains the following:

"MR. HELIS [Cheers' attorney]: Judge, I advised Mr. Cheers that he does have a Fifth Amendment right against self-incrimination. I have advised him that he does not have to testify in this matter, if he does not wish to. I have also advised him that he does have the right to testify, if he wishes to.

I further advised him, Judge, that if he does choose to testify, there are possibly elements in his testimony which maybe [sic] used by the State or by the Court in considering what the appropriate sentence would be. And that that sentence, based on his testimony in this matter maybe [sic] something other than the 8 [sic] years offered in the pretrial conference.

THE COURT: All right. *** Do you understand that.

MR. CHEERS: Yes.

THE COURT: When you [Cheers] entered a plea of guilty, the state [sic] read certain facts into the record. And your attorney agreed, at that time, that those facts would be the facts that would be the facts that would take place at any trial.

And among those facts, as I remember and my notes indicate, is that when you committed this offense for which you entered a plea of guilty, you committed it with Mr. Cheers—Mr. King.

MR. CHEERS: No.

THE COURT: Okay. Wait a second. I'm just telling you what my memory of the plea was.

Under those circumstances, that was the understanding that I had at the time that the plea was given. And at the time that I offered you 8 [sic] years.

Now, I'm not telling you what to do and I'm not advising you what to do. I just wanted you to know that if you do testify and you testify in a manner that I believe is perjurious, which would be not the truth, I would, on my own motion, vacate the plea of guilty. You'd then be as if the plea had never taken place. And we'd probably have to have a trial in connection with that matter.

However, if you testified in this matter and testify in what I believe is a truthful manner, I would not vacate that plea and I would allow you then to be sentenced to the 8 [sic] years that we previously agreed upon.

Now, I'm just—I want to know that when you pled guilty, the facts that were referred to in front of me, and which you listened to and after which you heard those facts, you agreed to pled [*sic*] guilty, those facts included the fact that you committed the crime with Mr. King.

\* \* \*

MR. CHEERS: To my knowledge, that I was pleading guilty to the crime, true enough. I understand that. But I had stipulated that it was—King have nothing to do with me.

THE COURT: I didn't hear any such stipulation. If there was such a stipulation, I didn't hear it. But I just wanted to let you know just what the facts are as far as I can see it. Whether or not in your mind you had a different thought, I don't know, because I can't read your mind. I'm just telling you what I know and what the facts [are] as far as I can remember.

\*\*\*

Mr. Kloak is going to call you as a witness on behalf of the—of the defendant. You have a right to testify if you wish to. You also have a right, because you still are in jeopardy, so to speak, some things can happen to you which could effect [*sic*] your freedom, et.cetera [*sic*], because you have not been convicted. You have a right to exercise your Fifty [*sic*] Amendment right and not testify for fear that what ever you might testify to could be used against you. \*\*\*

\* \* \*

THE COURT: I'm going to ask you now, Mr. Cheers, are you going to testify in this matter?

MR. CHEERS: No. I plead the Fifth."

Following defendant's conviction, his attorney obtained an affidavit from Cheers. Cheers swore he committed the armed robbery of Harris with Thomas Matthis. Cheers stated that Matthis was approximately 29 years old at the time of the robbery. Matthis was of slim build, 6 feet tall with a moustache and chin whiskers. During the robbery, Matthis wore a white baseball cap, a long trench coat and blue jeans, and there were no lights on in the stairwell where they robbed Harris. Cheers stated that when he pled guilty, he did not say that defendant had committed the robbery with him. Further, Cheers swore that he would have testified at defendant's trial, but he was afraid that if he did testify, the trial court would not sentence him to the eight years' imprisonment for which he had plea bargained.

First, defendant argues that the trial court significantly influenced Cheers' decision to invoke his fifth amendment right and refuse

to testify on behalf of defendant, thereby depriving defendant of his due process rights (U.S. Const., amend. XIV; Ill. Const. 1970, art. I, §2), and his right to present evidence in his own defense (U.S. Const., amend. VI; Ill. Const. 1970, art. I, §8). The trial court informed Cheers that it would interpret exculpatory testimony for defendant as perjury. The trial court also stated that if it believed Cheers' testimony to be perjurious, the court would *sua sponte* vacate his plea of guilty and revoke the promise of an eight-year sentence. After hearing the above comments and conferring with his attorney, Cheers took the stand and invoked his fifth amendment right not to testify. As Cheers later explained in his affidavit, he decided not to testify on behalf of defendant because he feared the trial court would retaliate by revoking his plea bargain.

Even though defendant raised the issue in his written posttrial motion for a new trial, the State argues that the above issue was waived because defendant failed to make a contemporaneous objection to the trial court's admonishment. Generally, failure to make an objection during trial results in a waiver of the issue. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186, 522 N.E.2d 1124, 1131-32.) Plain errors or defects affecting substantial rights, however, may be reviewed although they were not brought to the attention of the trial court. (107 Ill. 2d R. 615(a).) If the complained-of error was of such magnitude or so fundamental that the defendant was denied a fair trial, a reviewing court may address the error. (*People v. Herrett* (1990), 137 Ill. 2d 195, 209-10, 561 N.E.2d 1, 7-8.) Review of such plain error preserves the integrity and reputation of the judicial process. (*Herrett*, 137 Ill. 2d at 210, 215, 561 N.E.2d at 8, 10-11.) Where there is alleged misconduct by the trial judge, a less rigid application of the waiver rule must prevail. (*People v. Sprinkle* (1963), 27 Ill. 2d 398, 399-401, 189 N.E.2d 295, 297; *People v. Kelley* (1983), 113 Ill. App. 3d 761, 766, 447 N.E.2d 973.) We, therefore, review the issue of the trial court's admonishment of Cheers under the plain error doctrine.

We agree that defendant's due process rights (U.S. Const., amend. XIV; Ill. Const. 1970, art. I, §2), and his right to present evidence in his own defense (U.S. Const., amend. VI; Ill. Const. 1970, art. I, §8) were violated. In *Webb v. Texas* (1972), 409 U.S. 95, 34 L. Ed. 2d 330, 93 S. Ct. 351, the United States Supreme Court held that singling out a defendant's only witness and admonishing that person of the dangers of perjury, along with implying that the witness' testimony would be perjurious and that penal consequences would ensue, deprived the defendant of due process by scaring the witness from testifying. *Webb*, 409 U.S. at 97, 34 L. Ed. 2d at 333, 93 S. Ct. at 353.

*Webb* is similar to the case at bar. In the case at bar, the trial court singled out Cheers, admonished him of the dangers and consequences of perjury and implied that Cheers would lie if he testified on behalf of defendant. The circumstances in the case at bar are even worse than those in *Webb*. Here, the trial court had reserved Cheers' sentencing for a later date and stated that it would revoke the plea bargain if it "believed" Cheers had perjured himself. In *Webb*, the trial court threatened to "prosecute" the witness if the court believed the witness' testimony to be perjurious. Such a prosecution would require the State to prove perjury beyond a reasonable doubt. The potential for retaliation was much more direct and immediate in the case at bar than in *Webb*.

Further, there is evidence in the record that Cheers did not agree with *all* the facts to which his attorney stipulated. During Cheers' plea hearing, Cheers responded to the trial court, "Yes, sir, but that would make me, me and Arthur King, we ain't connected with nothing." Then when Cheers was called by defendant's attorney to testify on defendant's behalf, Cheers stated that he did not agree at his plea hearing that defendant was his partner in the crime. In fact, Cheers informed the trial court of his understanding of his plea by saying, "To my knowledge, that I was pleading guilty to the crime, true enough. I understand that. But I had stipulated that it was—King have [*sic*] nothing to do with me." The trial court's admonition of Cheers resulted in Cheers' fear of giving favorable testimony on behalf of defendant and, ultimately, Cheers' decision to invoke his fifth amendment right, thereby depriving defendant of due process and his right to present his defense. Defendant, therefore, is entitled to a new trial.

Second, defendant argues that Cheers' affidavit constitutes newly discovered evidence which entitles defendant to a new trial. Since we have decided to remand this case for a new trial, this issue is moot.

For the foregoing reasons, the conviction and sentence of the circuit court of Cook County is reversed and this case remanded for a new trial.

Reversed and remanded.

CAMPBELL and MANNING, JJ., concur.