THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DANIEL BLALOCK, SR., Defendant-Appellant.

Second District   No. 2—91—0561

Opinion filed January 22, 1993.—Rehearing denied February 17, 1993.

G. Joseph Weller and Patrick M. Carmody, both of State Appellate Defender's Office, of Elgin, for appellant.

Michael J. Waller, State's Attorney, of Waukegan (William L. Browers and Martin P. Moltz, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

PRESIDING JUSTICE INGLIS delivered the opinion of the court:

A jury found defendant, Daniel Blalock, Sr., guilty of six counts of first-degree murder under section 9—1 of the Criminal Code of 1961 (Code) (Ill. Rev. Stat. 1989, ch. 38, pars. 9—1(a)(1), (a)(2), (a)(3)) and two counts of armed violence under section 33A—2 of the Code (Ill. Rev. Stat. 1989, ch. 38, par. 33A—2). Defendant was sentenced to a term of natural-life imprisonment. The following issues are raised on appeal: (1) whether the mittimus must be amended to reflect convictions of two counts of first-degree murder; (2) whether the trial court infringed on defendant's right to due process of law when it told a witness for the defense that testifying could possibly result in self-incrimination; (3) whether the prosecutor misstated the law in closing argument; (4) whether error occurred if the trial court failed to con-

sult with defense counsel after receiving three notes from the jury during deliberation; and (5) whether the trial court erred in refusing to appoint new counsel after defendant alleged in a post-trial motion that counsel was ineffective.

On February 18, 1988, the police discovered the bodies of Santos Escobedo and Domingo Garcia, Jr., in an apartment building in Zion, Illinois. Defendant, Theodore Knox, Oscar Parham, Ronald Walker and Daniel Blalock, Jr., were charged, *inter alia*, with first-degree murder.

The evidence adduced at trial showed that the killings resulted from a drug deal gone awry. Defendant was "The Godfather" of a drug dealing "family" comprised of him, Blalock, Jr., Knox, Parham, and Walker. Walker testified that the family was at the apartment of Katrina Conner, Parham's girlfriend, which was a frequent hangout for the family. Around noontime, Knox came to the apartment and informed the group that someone wanted to sell them marijuana. The group smoked a sample of the marijuana and agreed that they would purchase the marijuana. Defendant, Parham, Knox and Blalock, Jr., took a scale into the laundry room of the apartment building, adjacent to Conner's apartment, to consummate the deal. Walker testified that he stayed behind in Conner's apartment.

Walker further testified that he heard gunshots a few minutes after the group left. Knox called to Walker. Walker entered the laundry room and saw Knox struggling with an Hispanic male. A second Hispanic male was lying on the floor with a gunshot wound in his head. No one else was in the room. Walker threw the Hispanic male off Knox, and Knox shot him in the head. Knox then shot the other Hispanic male who was on the ground two or three times. Walker also acknowledged that "a set-up" meant robbery in the family jargon.

On February 21, 1988, defendant was interviewed by Detective Don Tessmann of the Waukegan police department. Defendant stated that he arranged a drug deal involving the victims, but went to Chicago after introducing the parties. When he arrived in Chicago, he heard that the deal had gone bad and some people had been killed.

Officer Frank Messina, a Chicago police officer, took a robbery report from defendant at the corner of California and Courtland in Chicago on February 17, 1988. Defendant claimed that three Hispanic males robbed him, Blalock, Jr., and Parham at approximately 2:45 p.m. Defendant stated that the three individuals took money, six rings, a silver rope chain and a fur coat. Blalock, Jr., reported as stolen a black vest and various forms of identification.

David Caples, an inmate at the Joliet Correctional Facility, testified about a conversation he had with defendant when defendant was incarcerated late in 1988. Defendant told Caples that the drug deal on February 17, 1988, was "a set-up." Defendant stated that the victims were "narc agents" and had to be killed. Defendant further stated that Knox was a coward and did not want to participate when the others were shooting.

Tim Allen, incarcerated at the Lake County jail with defendant in the summer of 1990, testified that defendant stated that he knew the victims were police because they did not check the merchandise. After the victims did not check it, defendant picked up his cocaine and left. Defendant stated that if he thinks someone is a cop, he will kill him. Referring to the murders, defendant said "we did it" and at other times said "they did it." Defendant told Allen that the police "ain't got nothin" to tie him to the murders. Defendant stated if he was worried that someone would talk to the police he would kill him, even if it was a family member. He said it would be nothing personal, but would be business.

Defendant subpoenaed Knox to testify in his defense. Knox's attorney filed a motion to quash the subpoena. He argued that even though Knox was willing to testify, Knox's attorney believed that Knox was going to testify because he feared defendant. The trial judge met with Knox, Knox's attorney, and the attorneys in the case in the judge's chambers. Knox told the trial judge that he wanted to testify. The trial judge explained Knox's fifth amendment rights to him and stated that it would be "foolish" for Knox to testify because of the potential danger of self-incrimination. Defense counsel stated that he did not anticipate calling Knox until the following day, and Knox was given until the next day by the trial court to contemplate his decision. When Knox returned the following day, he exercised his privilege against self-incrimination.

After the jury retired to deliberate, the common-law record reflects that the jury asked the court three questions. A response to one question was given, apparently written by the trial judge. The question was whether the transcripts from Tuesday could be reviewed. The response was: "You have the facts, evidence and the instructions. It is your duty to follow them." No written response was given to the other two questions, which were a request for the judge to explain legal terms and a request for a dictionary. The report of proceedings contains no testimony concerning these exchanges.

The jury returned a verdict of guilty on six counts of first-degree murder and two counts of armed violence. At defendant's post-trial

hearing, defense counsel informed the court that defendant wished to raise an ineffective assistance of counsel argument in his post-trial motion. Defense counsel moved to withdraw his representation. The trial court denied the motion, stating that it would do an injustice to defendant because defense counsel was most familiar with the case. After defendant's post-trial motions were denied, he filed a timely appeal.

■■ We initially note that both the State and defendant agree that defendant's mittimus should be amended to reflect convictions of two counts of first-degree murder. The number of murder convictions should equal the number of victims killed. (*People v. Waldron* (1991), 219 Ill. App. 3d 1017, 1038.) Here, there can be two convictions for the two murders. However, when multiple convictions arise out of a single act, the sentence is imposed for the most serious offense. (*Waldron*, 219 Ill. App. 3d at 1038.) Thus, we remand for the correction of defendant's mittimus to reflect convictions of two counts of first-degree murder under section 9—1(a)(1) of the Code, one conviction for each victim. The convictions under sections 9—1(a)(2) and 9—1(a)(3) of the Code should be vacated. The mittimus should continue to reflect the convictions of two counts of armed violence.

■■ The State has argued that defendant has waived review of issues II (witness incrimination), III (improper closing argument) and IV (*ex parte* communication) for failing to include them in his post-trial motion. Generally, the failure to include an issue in a post-trial motion results in waiver. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186.) Plain errors may be reviewed although not brought to the attention of the trial court. (134 Ill. 2d R. 615(a).) Reviewing such errors preserves the integrity and reputation of the judicial process. (*People v. Herrett* (1990), 137 Ill. 2d 195, 210.) Thus, we will review issues II, III and IV under the plain error doctrine.

### PRIVILEGE AGAINST SELF-INCRIMINATION

At issue is whether the trial court infringed upon defendant's due process rights when informing Knox of the danger of self-incrimination if he testified. Defendant claims that the trial judge's remarks effectively drove the witness off the witness stand. He argues that although the trial court may have been well-intentioned, it overstepped the bounds of permissible judicial intervention.

While in the trial judge's chambers, Knox stated that he wished to testify on behalf of defendant. During the conversation, the trial judge made these statements:

"If you were to testify and if some of the questions that were asked were of an incriminating nature, I can only encourage you to exercise those rights that are given you and refuse to answer.

\* \* \*

This is a right you have, and it is a very valuable and important right. From what I have gathered in this case, I think it would be foolish for you not to exercise your right.

\* \* \*

We'll have you back tomorrow to see what your response is; but for your information and edification, Mr. Walker has testified and Mr. Allen has testified or will shortly testify, Mr. Caples has testified; and I just want you to know that they have testified, and the State's position on this is they don't care if you testify or not.

Finally, once again, based on the evidence that I have heard, I think it is foolish if you do not exercise your privilege under the law, and we'll have you back tomorrow."

Knox returned to court the following day and exercised his privilege against self-incrimination.

In part, the fifth amendment provides that no person shall be compelled to testify against himself or herself in a criminal case. (U.S. Const., amend. V; Ill. Const. 1970, art. I, §10.) A witness may invoke the fifth amendment and refuse to answer questions of an incriminating nature. (*People v. Redd* (1990), 135 Ill. 2d 252, 304.) Although the trial court does not have an affirmative duty to warn of potential incrimination, the court has the discretion to so advise the witness when the need arises. *People v. Pantoja* (1976), 35 Ill. App. 3d 375, 380; see also *West v. Boehne* (1992), 229 Ill. App. 3d 1045, 1054-55.

■ Notwithstanding the State's contention that this issue has been waived because of defendant's failure to object to the trial court's admonition, we hold that the trial court did not infringe on defendant's due process rights when warning Knox. On the record, Knox's counsel stated that his client was following "our advice" by exercising his fifth amendment right to remain silent. Knox stated on the record that he wanted to remain silent. Also, we find it significant that the trial judge admonished Knox in response to a motion to quash the subpoena and not *sua sponte*.

It was appropriate for the trial judge to inform the witness of his right to remain silent. However, we believe it was inappropriate for the trial judge repeatedly to inform the witness of this right and editorialize that testifying would be foolish. Nevertheless, the trial

judge's comments did not rise to the level of reversible error. Viewing the trial court's statements together with those of Knox's counsel, we believe that the trial court's warning had little persuasive effect on Knox, but allowed him the additional time to make an informed decision.

The cases cited by defendant to support his argument are distinguishable. In *Webb v. Texas* (1972), 409 U.S. 95, 34 L. Ed. 2d 330, 93 S. Ct. 351, the trial court informed the defendant's only witness that if he lied "the Court will personally see that your case goes to the grand jury and you will be indicted for perjury." The trial court also stated that he would likely be convicted of perjury and "it would be stacked onto what you already got." (*Webb*, 409 U.S. at 96, 34 L. Ed. 2d at 332, 93 S. Ct. at 352.) The Supreme Court held that the admonition was improper because, through his statements, the trial judge implied that he expected the witness to lie. The judge's threatening remarks exerted such duress on the witness' mind that the witness was effectively driven off the stand. *Webb*, 409 U.S. at 97-98, 34 L. Ed. 2d at 333, 93 S. Ct. at 353.

In *People v. King* (1992), 228 Ill. App. 3d 519, a codefendant was called as a defense witness in the defendant's trial. The witness had already negotiated a guilty plea with the trial judge in which the witness' attorney stipulated that the witness and the defendant participated together in the armed robbery. (*King*, 228 Ill. App. 3d at 521.) The trial judge informed the witness that if he testified differently from the stipulated facts at his plea hearing, the judge would vacate his guilty plea. The witness would then be subjected to a trial. The witness exercised his fifth amendment rights. (*King*, 228 Ill. App. 3d at 522-23.) The appellate court held that the trial court's admonishment was improper because the judge implied that the witness would lie if he testified on behalf of the defendant. Further, the record showed that the witness did not agree with all the facts his attorney stipulated to at the plea hearing. *King*, 228 Ill. App. 3d at 525.

Finally, defendant cites two California cases: *People v. Schroeder* (1991), 227 Cal. App. 3d 784, 278 Cal. Rptr. 237, and *Berg v. Morris* (E.D. Cal. 1980), 483 F. Supp. 179. In *Schroeder*, the reviewing court held that the trial judge's repeated warnings about incrimination exceeded the court's duty to apprise the witness of the privilege against self-incrimination. Defense counsel even acknowledged to the trial judge that his comments were bordering on "coercion and intimidation." (*Schroeder*, 227 Cal. App. 3d at 793, 278 Cal. Rptr. at 242.) In *Berg*, the witness was told that if he did not tell the truth, his probation would be revoked and perjury charges would be filed against him.

(*Berg*, 483 F. Supp. at 181.) The witness was also detained when court was adjourned over the weekend. The witness, who originally did not implicate the defendant, thereafter changed his testimony and implicated the defendant. (*Berg*, 483 F. Supp. at 182.) The district court granted the defendant's *habeas corpus* petition because the trial court impermissibly interfered with the defendant's right to present the testimony of his witnesses. *Berg*, 483 F. Supp. at 183-84.

In nearly all the cases cited by defendant, the witness in question was presented with an "if-then" proposition. The trial judge, implying that he anticipated the witness would lie, informed the witness of the adverse consequences of testifying. The witnesses then exercised their privilege under the fifth amendment for fear of having probation revoked or their plea agreements vacated. No such threat was presented to Knox here.

The case at bar is analogous to *People v. Young* (1992), 231 Ill. App. 3d 40, in which the trial judge did not threaten the witness with perjury charges or a vacation of a plea agreement. The witness was informed that he could withdraw his guilty plea before testifying or exercise his fifth amendment right. (*Young*, 231 Ill. App. 3d at 43.) Similarly, Knox was merely informed that testifying when he was implicated in the crime would be "foolish." This statement by the trial court did not rise to the level of coercion or intimidation displayed in *Schroeder* or to the level of reversible error. Thus, we hold that defendant was not denied due process of law based on the trial court's warning to Knox.

### CLOSING ARGUMENT

Defendant contends that the prosecutor misstated the law in closing argument. In his rebuttal argument, the prosecutor stated:

"If you find that before this took place that he set up this drug deal, you must convict him of every count. If you find that getting this scale, as being part of a set-up, you must convict him of every count. If you find that he played any part of this whatsoever, you must convict him of every count.

MR. WALDECK [defense counsel]: Judge, I object. It is not the law.

MR. STRICKLAND [prosecutor]: That is the law. I am arguing. It is argument.

THE COURT: Overruled."

Defendant argues that in order for him to be guilty of felony murder, he must be found to have attempted or committed a forcible felony other than second-degree murder. (See Ill. Rev. Stat. 1989, ch.

38, par. 9—1(a)(3).) He claims that delivery or possession of cannabis is not a forcible felony under section 2—8 of the Criminal Code of 1961 (Ill. Rev. Stat. 1989, ch. 38, par. 2—8). The State counters that the evidence showed that "the family" used the term "a set-up" synonymously with robbery, which is a forcible felony needed to support a felony murder conviction.

The prosecutor has wide latitude in closing argument, and allegedly improper comments should be considered in context with both the State's and the defense's arguments. (*People v. Gant* (1990), 202 Ill. App. 3d 218, 224.) Remarks made at closing argument must be based on the evidence presented or reasonable inferences therefrom. (*People v. Cisewski* (1987), 118 Ill. 2d 163, 175-76.) Improper remarks are harmless error if there is overwhelming evidence of guilt, and a new trial will not be granted unless the remarks were so prejudicial that they materially contributed to the defendant's conviction. *Gant*, 202 Ill. App. 3d at 225.

■ Defendant argues that a prosecutor is not to misstate the law in closing argument, citing *People v. Weinstein* (1966), 35 Ill. 2d 467. However, in *Weinstein*, the prosecutor argued that the defendant had the burden to introduce evidence creating a reasonable doubt of guilt before she could be found not guilty. (*Weinstein*, 35 Ill. 2d at 470.) Such an egregious misstatement of law did not occur here. The evidence presented at trial supported the prosecutor's theory that the drug deal was a robbery. Walker testified that "a set-up" was a term used by the family to mean a robbery. Defendant referred to the drug deal in his conversation with Caples as "a set-up." Walker also testified that defendant went into the laundry room of the apartment building to meet with the victims. Thus, as the prosecutor stated to the jury, if it found that defendant was part of the "set-up" when he took the scale into the laundry room, defendant could be convicted of first-degree murder under the theory of accountability. See Ill. Rev. Stat. 1989, ch. 38, par. 5—2.

Also, under section 5—2(c) of the Criminal Code of 1961, defendant could be held accountable if, before the commission of the offense, defendant participated in the planning or commission of the offense. (Ill. Rev. Stat. 1989, ch. 38, par. 5—2(c).) Again, there was evidence for the prosecutor to infer that defendant planned a robbery. Officer Tessmann testified about his conversation with defendant in which defendant acknowledged setting up the drug deal. Defendant told prison inmates that the deal was "a set-up" from the start. Walker testified that "a set-up" was synonymous with a robbery. Based on this evidence, the prosecutor could argue that defendant is guilty of

felony murder under an accountability theory if the drug deal was "a set-up."

Finally, the prosecutor claimed that defendant was guilty of felony murder if defendant played any part in "this" whatsoever. Although "this" is an ephemeral term, when viewed in context with the arguments of the State and the defense, "this" refers to the drug deal which inferably was "a set-up" for a robbery. Under the analysis above, participation in the underlying forcible felony, in this case robbery, is the basis for a conviction of felony murder. (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(3).) Thus, we hold that, based on the evidence, the prosecutor's argument was not a misstatement of law.

Further, even if the jury may have been confused by the prosecutor's closing argument, the impact of the argument was negated by the proper jury instructions given to the jury. The instructions informed the jury of the law of accountability and first-degree murder based upon the robbery and not the drug deal. The jury was also instructed that closing argument is not evidence, and statements made by the attorney not based on the evidence should be disregarded. Any impact the prosecutor's closing argument had would not have been so prejudicial as to contribute materially to defendant's conviction.

### *EX PARTE* COMMUNICATION BETWEEN JURY AND TRIAL JUDGE

At issue is whether the trial court committed reversible error in communicating *ex parte* with the jury after it began deliberating. Defendant contends that, based on a lack of a record of communication between the jury and the trial judge, the trial judge must have communicated with the jury without the presence of the defendant or defense counsel. Defendant argues that *ex parte* communication between the judge and the jury during deliberation is *per se* reversible error.

The State contends that defendant must have been prejudiced by the *ex parte* communication for there to be reversible error. The State also argues that the record is insufficient to establish error as it is unclear from the record on appeal whether defendant or defense counsel was present when the judge responded to the jury.

During deliberations, the jury sent three questions to the court, one of which was answered, apparently by the trial judge:

"[Question]: Can we have transcript of Tuesday?

[Answer]: You have the facts, evidence and the instructions—it is your duty to follow them.

[Question]: Have judge visit to explain legal terms?

[Question]: Need dictionary 'abets.' "

A similar situation occurred in *People v. Scott* (1989), 192 Ill. App. 3d 594. There, the defendant appealed based on two "ambiguous" notes that suggested *ex parte* communication between the judge and jury while the jury was deliberating. The defendant, as does defendant here, asked this court to remand to determine the circumstances surrounding the communication and order a new trial if *ex parte* communication occurred. (*Scott*, 192 Ill. App. 3d at 595.) This court denied the request. The defendant failed to provide a report of proceedings to determine whether defendant and his counsel were present. Doubts from the incompleteness of the record were resolved against the defendant. *Scott*, 192 Ill. App. 3d at 598.

In the case at bar, we have the report of proceedings, but it is not instructive as to whether defendant and his trial counsel were present when the judge responded to the jury's notes. Appellate counsel assumes that because the record is silent on this point it must mean that defendant and his counsel were not present. We, as the reviewing court, should not be left to speculate about these matters. If appellate counsel believes *ex parte* communication between the judge and jury has taken place, an affidavit from defendant's trial counsel clarifying that fact would be inordinately helpful. Based on the record before us, we follow *Scott* and hold that the doubts arising from the incompleteness of the record will be resolved against the appellant. See also *Foutch v. O'Bryant* (1984), 99 Ill. 2d 389.

Even if we assume that *ex parte* communication occurred here, we would find that the trial judge's actions would not be reversible error. Generally, the proper procedure when the jury communicates with the judge during deliberation is for the trial judge to discuss the request with the prosecutor and defense counsel before responding. (*People v. Tansil* (1985), 137 Ill. App. 3d 498, 501.) When the defendant and counsel are absent from such communication, the defendant must demonstrate that she or he suffered prejudice as a result for the error to require reversal. (*People v. Johnson* (1991), 146 Ill. 2d 109, 150; *Tansil*, 137 Ill. App. 3d at 501.) The key question in determining prejudice is whether defense counsel's presence could have had any effect on the communication (*People v. King* (1988), 165 Ill. App. 3d 464, 471-72) or the deliberative process (*Tansil*, 137 Ill. App. 3d at 501).

It is within the sound discretion of the trial court to allow or refuse a request by the jury to review testimony in a criminal case. (*People v. Queen* (1974), 56 Ill. 2d 560, 565-66.) The trial court is in a better position to assess the jury's request to determine whether reviewing the testimony would help the jury during deliberations. (*Tan-*

*sil*, 137 Ill. App. 3d at 502.) However, it is reversible error if the trial court refuses to exercise its discretion under the erroneous belief that it has no discretion to answer the question. (*Queen*, 56 Ill. 2d at 565.) Failure by the trial court to ascertain the specific testimony desired by the jury has been considered a signal that the trial court erroneously believed it lacked the discretion to grant the jury's request. *People v. Bryant* (1988), 176 Ill. App. 3d 809, 813; see also *Tansil*, 137 Ill. App. 3d at 503. But see *People v. Page* (1976), 39 Ill. App. 3d 728, 730 n.1 (where request for testimony is so broad that it would require inordinate delay or result in retrial by transcript, the request may be denied as unreasonable).

Although a request for the "transcript of Tuesday" is not particularly specific, considering that 14 witnesses testified on Tuesday, April 9, 1991, we do not believe that the trial judge thought he lacked the discretion to allow the request. The trial judge's written answer in no way suggests that he lacked the ability to provide the transcripts. Most of the cases cited by defendant to support his argument are distinguishable because the trial judges, through their written responses, demonstrated that they believed they could not grant the juries' requests. (*Queen*, 56 Ill. 2d at 565 (judge responded by writing: "I cannot have any testimony of any witnesses read to you"); *Tansil*, 137 Ill. App. 3d at 500 (judge responded by claiming that the jury is not permitted to receive any part of a witness' written testimony); see also *People v. Walker* (1992), 230 Ill. App. 3d 292, 296-97.) Moreover, defendant's reliance on a recent Appellate Court, First District, case, *People v. Childs* (1992), 230 Ill. App. 3d 993, is misplaced because it did not deal with a jury's request to review testimony, but involved a question of law.

The jury's second note asked the trial judge to explain legal terms, and the third note requested a dictionary to define the word "abets." Apparently, the trial judge did not respond to these requests. We find that the trial court's response, or lack of one, was appropriate. The trial judge is not required to answer a jury's question when the jury instructions are sufficient. (*People v. Petty* (1987), 160 Ill. App. 3d 207, 213.) The court also has the discretion to refuse a request for a dictionary. (*Petty*, 160 Ill. App. 3d at 213.) The jury instructions were in plain language which an average person could understand. Thus, the trial court did not abuse its discretion by not sending a written response to these requests.

Assuming *ex parte* communication occurred, we would hold that defendant was not prejudiced by the trial court's alleged failure to inform him or defense counsel of the jury notes. The trial court's re-

sponse to the jury's requests was within its sound discretion. Thus, the alleged *ex parte* communication did not result in reversible error.

### TRIAL COURT'S REFUSAL TO APPOINT NEW COUNSEL

Defendant's final contention is that the trial court abused its discretion in denying his request for new counsel at the post-trial stage of proceedings. He argues that his trial counsel had been ineffective for tampering with Knox's decision not to testify. Defendant also claims that trial counsel was ineffective because he failed to inform a witness that she had to appear in court.

The State argues that *People v. Krankel* (1984), 102 Ill. 2d 181, the case primarily relied upon by defendant, does not stand for the proposition that new counsel should be appointed in every post-trial claim of ineffective assistance of counsel. The State also claims that both allegations of ineffective assistance were solely matters of trial strategy. Thus, the trial judge properly denied defendant's request.

We believe that the case cited by the State, *People v. Washington* (1989), 184 Ill. App. 3d 703, is instructive. In *Washington*, this court outlined the procedure for appointing new counsel for post-trial proceedings:

"The holding in *Krankel* has been interpreted by the appellate court not to establish a *per se* rule that all *pro se* motions for a new trial by defendants alleging ineffective assistance of counsel mandate appointment of new counsel to assist in the motion irrespective of the basis of the motion and in the absence of a request for new counsel. [Citations.] Rather, the trial court should examine the factual matters underlying the defendant's claim, and, if the claim lacks merit or pertains to matters of trial strategy, then no new counsel need be appointed. Only if the allegations show possible neglect of the case for which counsel could undertake an independent evaluation of defendant's complaint and present the matter to the court should new counsel be appointed." *Washington*, 184 Ill. App. 3d at 711.

■■ We have reviewed defendant's two claims of ineffective assistance of counsel and find that they both lack merit. Defendant's counsel indeed told Knox to listen to Knox's attorney, but that statement in no way encouraged Knox not to testify. In fact, defendant's counsel made it a point to state on the record that he never had a conversation with Knox unless in the presence of the court or Knox's attorneys. Defense counsel also stated:

"Judge, at no time did I ever inform him that he should not testify. In fact, what I did, the only statement that I asked, I

asked him or, in fact, told him that he should listen to his lawyers and never advised him one way or the other which way to testify."

This statement does not demonstrate neglect on the part of defense counsel.

Further, defendant's allegation that his counsel failed to inform a witness to appear in court to testify is not neglect. The record reveals that defense counsel made no less than five telephone calls from his personal residence informing the witness to appear in court. Our reading of the record shows that defendant's allegation is baseless. The trial court did not err in denying defendant's request for new counsel to argue his motion for a new trial.

For the foregoing reasons, the judgment of the circuit court of Lake County is affirmed.

Affirmed.

McLAREN and BOWMAN, JJ., concur.