THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. RONALD RADOVICK, Defendant-Appellant.

First District (6th Division)   No. 1—92—3831

Opinion filed October 6, 1995.

Michael J. Pelletier and Anna Ahronheim, both of State Appellate Defender's Office, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Kathleen Bom, Assistant State's Attorneys, of counsel), for the People.

JUSTICE ZWICK delivered the opinion of the court:

Defendant, Ronald Radovick, was indicted and convicted following a jury trial of the first degree murder of Regina Newton. The trial court entered judgment and subsequently sentenced defendant to a term of 75 years in the Department of Corrections. Defendant now appeals.

Regina Newton was forcibly drowned in the late evening hours of April 2, 1991, near the Maple Lake fisherman's overlook in the Cook County Forest Preserve. She had been severely beaten before being killed. While defendant admitted at his trial that he, John Janes and another friend, Donald Grant, were near the scene of the murder when Newton was killed, he testified that he and Grant did not participate in the murder. Defendant instead asserted Janes alone killed Newton.

The State's case against defendant was based principally upon the grand jury testimony of friends of the defendant, Joanne, Robert, Maggie and Jennifer Schell. Initially, Joanne Schell told police that the defendant had spent April 2 and April 3 with her in the Schell home. However, several months later, Joanne recanted her statements and told prosecutors that she and her family had been

threatened by defendant and coerced into providing him with an alibi. The four Schells testified before the grand jury that they had been threatened by defendant and that defendant admitted helping Janes kill Regina Newton. By the time of trial all of the Schells had recanted significant portions of their grand jury testimony. The trial court ruled that the State would be permitted to introduce the Schells' grand jury testimony in its entirety as substantive evidence against the defendant.

In addition to presenting his own testimony that he did not participate in the killing, defendant called both John Janes and Donald Grant as witnesses on his behalf. At the time of defendant's trial, however, Janes had been indicted and refused to testify, asserting his fifth amendment right against self-incrimination. Grant was not indicted and appeared in court on defendant's behalf. Grant told the court before testifying that he had consulted with a lawyer and wished to testify as a defense witness. After the trial court repeatedly admonished Grant regarding his fifth amendment rights and after the court appointed a lawyer to discuss his fifth amendment rights with him, Grant changed his mind and declined to testify.

Following the loss of Grant as a witness, defendant sought to introduce prior testimony made by Grant to the grand jury which supported defendant's version of events. Specifically, Grant testified before the grand jury that he spent the evening of April 2 with the defendant, Janes and Newton driving around in defendant's car. Newton and Janes were arguing with one another and, at one point, Janes became "pissed off about something" and slapped Newton. Janes said, "take her to Maple Lake." When the four arrived at Maple Lake, the defendant sat in the car with Grant in a parking lot while Janes went with Regina Newton down to a trail near the water, away from the car. The parking lot was near a hill and a drop-off led down to the water. Grant and defendant could not see Janes and Newton from their vantage point. When Grant and defendant heard Newton screaming, defendant left Grant and went down to the trail to see what was happening. Grant stayed by the car. Grant testified that he heard defendant scream "look what you are doing!" Grant then went to the edge of the parking lot to see what was happening below near the water, he saw the defendant "half way down there." Janes at this time was standing in the water over Newton's body, kicking her in the stomach. Janes was screaming, "Die bitch!" The trial court held that this grand jury testimony was hearsay and could not be properly admitted into evidence.

Defendant first argues that he was denied his fundamental right to present his defense by the trial court's repeated warnings to Don-

ald Grant regarding self-incrimination. Defendant claims these warnings were excessive and "drove Grant from the witness stand." We agree.

Just prior to Grant's taking the witness stand as part of the defendant's case, the prosecutor, outside the presence of the jury, asked the court to advise Grant of his fifth amendment rights against self-incrimination. The prosecutor also requested that counsel be appointed for Grant if Grant appeared without a lawyer. At this point, counsel for the defendant indicated that Grant had a private attorney named James Porn who had already spoken with Grant regarding his testimony. Defense counsel objected to the prosecution's request that Grant be admonished, arguing that the State was simply trying to intimidate Grant.

The record then shows the following exchange between the court and Grant:

"THE COURT: I don't know what your lawyer told you, I want somebody in front of you. You have the right to have [c]ounsel. I have a duty to tell you that before you testify that you have right to have the advice of counsel and make sure what the legal ramifications of you testifying here and after you learn what the real ramifications are then you could decide to testify which is fine with me. If you decide not to testify that is fine with me, too, but I want to make sure you understand what is being said and done before you do it. Do you want to talk to the [p]ublic [d]efender. Fine. You can talk to him. You can follow his advice. You don't have to follow his advice. He will just tell you these are the rules. These are the possible exposures if you do wish to testify. Fine. What you tell him is held in confidence. No one knows about it. The [c]ourt never finds out about it. State never finds out about it. Defense doesn't find out about it. You have a private lawyer. Fine. If you want for purposes before your testimony today in this court if you want to just converse with the P.D. I will appoint him. You're not giving up any rights that you have. I just want to make sure that you're fully advised because after the P.D. talks to you I will just ask not what you said, but did he advise you of your rights. Yes. Does he wish to testify? Yes. Fitness; no problem. If you say no and you want to exercise some rights you have, I have no problem with that. See once you take the stand it's all over with. Then you have to testify. I just want to make sure that you understand.

* * *

Do you want to talk to the P.D. one time; it's between you and him?

MR. GRANT: I don't really think it's necessary. I spoke with

my attorney. He said nothing really could be done and answer whatever they want.

THE COURT: May I ask the name of your lawyer?

MR. GRANT: James Porn. Suite 2505 on 180 North La Salle."

Following the judge's statements to Grant, the prosecutor and defendant's attorney attempted to reach attorney James Porn on the telephone, but were told by a switchboard operator that he was not at his desk. They reported this fact to the court. The trial court, then recognizing that a conflict of interest would occur if a public defender were appointed to represent Grant, suggested that a special attorney from the public defender's multiple defendant unit be appointed for Grant. Defense counsel objected to such a procedure, noting that Grant had already indicated that he had spoken with an attorney and had been advised to testify. Defense counsel also noted that Grant had already testified before the grand jury. The trial court did not address defense counsel's objections, but returned to the courtroom and again addressed Grant:

"THE COURT: We can't reach [Mr. Porn]. [The] State has made a phone call. It was made along with [c]ounsel for the [d]efendant here. [You are] twenty some years of age. [You have a] right to have an attorney. I forget [sic] that the P.D.'s Office is representing a [c]o-defendant here. I can get somebody from [the public defenders special unit] which is a separate office or I can get a private attorney and see to it that he's paid. If you want to pass that and call another witness and talk to him for fifteen, twenty minutes. Fine. [I] cannot make you have an attorney or talk to an attorney. My question to you is if you don't want to be put in that position and your lawyer—you're telling me he told you to tell the truth; you got other problems. Don't worry about it. Fine. You talk to the private lawyer; fine. If you don't want to talk to the private lawyer; fine. I will provide you one free of charge if you want one. I will get a lawyer in the building here. It won't cost you nothing [sic], but then again you have a right to say I don't want to talk to no [sic] lawyer. I will testify. It's up to you. You're the witness here. You have the right to testify. You've been subpoenaed in. I just want to make sure. I'm not trying to scare you. Understand the facts. Do you want me to get a private lawyer to talk to you without charge to you? Pass it. Call in other witnesses and then come back?

MR. GRANT: I will testify. I don't see no [sic] reason why.

THE COURT: I'm not saying you have anything to hide. You're telling me basically you wish to testify. You do not wish me to appoint a private attorney to explain what your rights and options are. You don't want to discuss this and make arrangements to get

the [special unit] in and talk to you today. It would be done right now.

MR. GRANT: I don't see why.

THE COURT: You see no reason why.

MR. GRANT: Yeah.

THE COURT: Okay. I have no problem with that."

At this point in the proceedings, Donald Grant had twice declined counsel and twice indicated that he wished to testify. The prosecutor then requested that the court "formally" advise Grant of his rights. The court obliged:

THE COURT: All right young man, your name in full.

MR. GRANT: Donald R. Grant.

THE COURT: Do you understand you're here in court today and you may be called to testify as a witness and you would be testifying under oath. Do you understand that?

MR. GRANT: Yes.

THE COURT: You also understand certain rights as a [d]efendant [sic]. Right to an attorney. Right to have any attorney you can afford. If you can't afford one or you would like to talk to him do you understand that I can appoint an attorney to represent you without charge.

\* \* \*

I would see to it that a private attorney in this building would talk to you, advise you of all your rights and it would be with no cost to you. We would see to it that the attorney was reimbursed for his cost at no expense. Do you understand that?

MR. GRANT: Yes.

THE COURT: My understanding is that you do not want to talk to any attorney at all, is that correct?

MR. GRANT: Yes, sir.

THE COURT: You also understand that anything that you say here under oath may and can be used against you in any criminal proceeding?

MR. GRANT: Yes, sir.

THE COURT: Knowing that do you still wish to testify without the advice of counsel—

MR. GRANT: Yes, sir."

Despite the fact that Grant stated for a third time that he wished to testify without consulting with counsel, the court persisted:

"THE COURT: You're telling me you discussed your potential testimony in full with your attorney and after hearing what you testified your own private attorney told you there's no problem with that; go to court and testify; is that what you're telling the Court or telling him you got a subpoena to go to court. I am not asking what your testimony is. I just want to make sure."

Grant replied that he had told his attorney "a little bit" about the case, "just, you know, the basics," and that his attorney had advised that he had "[n]othing to worry about now." The prosecutor then requested that an attorney be appointed for Grant in light of the fact that it appeared that Grant had not fully advised his own counsel of the situation. The trial court agreed and ordered that an independent attorney be found for Grant. Following consultation with the special court-appointed attorney, Grant invoked his fifth amendment rights and declined to testify.

This court has recognized that, while the trial court need not inform a witness of his or her fifth amendment privilege against self-incrimination, the court has the discretion to do so, particularly when the witness appears in court unrepresented. (*People v. Morley* (1994), 255 Ill. App. 3d 589, 597, 627 N.E.2d 397.) It has also been recognized, however, that a judge's conduct in admonishing a defense witness has the potential to improperly interfere with the defendant's right to a fair trial. (See, *e.g., Webb v. Texas* (1972), 409 U.S. 95, 34 L. Ed. 2d 330, 93 S. Ct. 351; *People v. Mancilla* (1993), 250 Ill. App. 3d 353, 620 N.E.2d 1163; *People v. Blalock* (1993), 239 Ill. App. 3d 830, 607 N.E.2d 645.) In *Morley*, for example, this court stated that the trial court which elects to admonish a witness " 'must walk the fine line between, on the one hand, fully advising the witness of the danger of self-incrimination and the right not to testify, and, on the other hand, threatening the witness to an extent which materially impairs the defendant's due process right to present witnesses in his defense.' " *Morley*, 255 Ill. App. 3d at 597, quoting *People v. Schroeder* (1991), 227 Cal. App. 3d 784, 788-89, 278 Cal. Rptr. 237, 239.

Our supreme court, in *People v. King* (1993), 154 Ill. 2d 217, 608 N.E.2d 877, addressed the issue of whether the trial court exceeded its discretion in admonishing a defendant's witness. The court held that, in order for a trial judge's admonitions to a potential witness to violate the due process rights of the accused, the admonitions must meet two tests. First, the admonishments given to the witness must be "somehow improper." The court stated, for example, that the judge's comments could be "unnecessarily strong" or "threatening." (*King*, 154 Ill. 2d at 224.) Second, the court's statements must be a possible cause of the witness' decision not to testify.

Subsequently, in *Morley*, this court noted that a trial judge's comments could amount to an abuse of discretion if they "actively encourage[d]" a witness not to testify or can be said to have "badger[ed] a witness" into remaining silent. (*Morley*, 255 Ill. App. 3d at 597, citing *United States v. Arthur* (6th Cir. 1991), 949 F.2d 211.) After reviewing the record, we conclude that the trial court's comments in this case satisfy both requirements set out by *King*.

■ First, the extent of the court's warnings to the witness in this case was clearly excessive. The court informed the witness that he had the right not to testify at least six times, and the witness indicated on at least three separate times that he wished to testify, despite the court's admonitions. Here, the court repeatedly badgered the witness, again and again discussing the possibility that he might wish to speak with a lawyer and reconsider his position. The court's statements were made even though Grant indicated he had already consulted with and been advised by his own private lawyer regarding his testimony.

Second, the court's repeated warnings to Grant were an obvious factor in his decision to take the fifth amendment. It is abundantly clear from the record that Grant wanted to testify on defendant's behalf. He came to court on two separate occasions and spoke with defense counsel on the phone before the trial. Grant had previously waived the fifth amendment when testifying before the grand jury and had elected to give police statements shortly after the murder. The State argues that, because Grant consulted with court-appointed counsel before invoking the fifth amendment, the trial court's comments could not have influenced Grant's decision not to testify. A more reasonable inference, however, is that the court's repeated admonishments contributed to his decision not to testify, particularly after the court appointed a new lawyer for him after being informed of his private attorney's advice. The only conclusion Grant could draw from this sequence of events is that the judge believed he had been given bad advice from his counsel and that the new counsel's advice should be followed. It is not surprising, therefore, that after he had consulted with appointed counsel, Grant elected for the first time to assert his fifth amendment right not to testify. After carefully reviewing the record, we conclude that the court's excessive and repeated lecturing of Donald Grant was a significant factor in influencing Grant's ultimate decision not to testify and could have influenced the ultimate outcome of defendant's trial. Grant was defendant's sole occurrence witness and could have convinced the jury that defendant did not participate in Newton's murder. In such a case, we must reverse defendant's conviction and remand the cause for further proceedings. See *People v. King* (1992), 228 Ill. App. 3d 519, 525, 593 N.E.2d 694, *aff'd* (1993), 154 Ill. 2d 217, 226.

Because we believe that several issues raised by the defendant in his current appeal may recur on remand, we elect to consider these issues out of concern for judicial economy. We first consider defendant's claim that Donald Grant's grand jury testimony should have been admitted into evidence once he asserted his fifth amend-

ment rights under the former-testimony exception or the statement-against-penal-interest exception to the hearsay rule. Should Grant again invoke his fifth amendment rights on remand, the issue will again be presented to the trial court.

In Illinois, a witness' previous testimony may be admitted into evidence at trial, as an exception to the hearsay rule, if the witness has become unavailable and the current opponent of the testimony had the opportunity to cross-examine the witness at the earlier hearing. (*People v. Horton* (1976), 65 Ill. 2d 413, 416, 358 N.E.2d 1121; *In re J.S.* (1987), 153 Ill. App. 3d 154, 157, 505 N.E.2d 1128; *People v. Aldaco* (1982), 107 Ill. App. 3d 672, 676, 437 N.E.2d 905.) It is only the second element that is in dispute in this case, as both the defendant and State agree that Grant's decision to take the fifth amendment rendered him "unavailable" for purposes of the rule.

When considering whether the prior testimony of an unavailable witness may be put into evidence under the former-testimony exception, we consider whether the party opposing the admission of the testimony has had a meaningful opportunity to cross-examine the witness. Our supreme court recently recognized that the test does not lend itself to a *per se* determination (*People v. Rice* (1995), 166 Ill. 2d 35, 39, 651 N.E.2d 1083); instead, the focus of the test must be on whether "the motive and focus of the cross-examination at the time of the initial proceeding [were] the same or similar to that which guides the cross-examination during the subsequent proceeding." (*Rice*, 166 Ill. 2d at 41.) Because the issue is one of the admissibility of evidence, the standard of review is whether the trial court's decision amounted to an abuse of discretion.

After considering the proper test, we cannot find error in the trial court's decision to refuse to put into evidence Donald Grant's prior grand jury testimony. In *United States v. DiNapoli* (2d Cir. 1993), 8 F.3d 909, the United States Court of Appeals, Second Circuit, considered the question of whether prosecutors necessarily have a similar motive to develop the testimony of a grand jury witness as they would have when that witness takes the stand at trial. The court found that simply because the prosecutor has tendered a witness to the grand jury does not necessarily guarantee that the witness' testimony would be vigorously challenged:

> "If a prosecutor is using the grand jury to investigate possible crimes and identify possible criminals, it may be quite unrealistic to characterize the prosecutor as the 'opponent' of a witness' version. At a preliminary state of an investigation, the prosecutor is not trying to prove any side of any issue, but only to develop the facts to determine if an indictment is warranted." (*DiNapoli*, 8 F.3d at 913.)

We find this logic persuasive and consistent with our own supreme court's recent decision in *Rice*. As the defendant's brief recognizes, the State may have presented Grant's testimony to the grand jury for any number of reasons, perhaps simply to "lock in" Grant's previous statements to police that Janes had killed Regina Newton. If the State had not yet developed sufficient facts implicating the defendant at the time of the grand jury hearing, prosecutors would have had little motive to challenge Grant's version of events at this time.

■ In short, the purpose for which the State offered Grant's grand jury testimony and the purpose for which Grant's testimony was later offered by defendant at trial are not so similar as to require us to conclude that the State had a meaningful opportunity to effectively cross-examine Grant. In light of the proper standard of review, we conclude that the trial court did not abuse its discretion in refusing to admit Grant's testimony under the former-testimony exception to the hearsay rule.

As an alternative basis for admitting Grant's grand jury testimony, defendant asserts the statement-against-penal-interest exception to the hearsay rule. An extrajudicial statement may be admitted into evidence under this exception if it contains sufficient indicia of reliability so as to be rendered trustworthy. (*Chambers v. Mississippi* (1973), 410 U.S. 284, 301, 35 L. Ed. 2d 297, 312, 93 S. Ct. 1038, 1048-49; *People v. Bowel* (1986), 111 Ill. 2d 58, 66, 488 N.E.2d 995; *People v. Mack* (1992), 238 Ill. App. 3d 97, 102, 606 N.E.2d 165.) The key to successfully invoking this exception is a showing that the hearsay statement was made under such objective circumstances as to provide considerable assurance of its reliability. (*Bowel*, 111 Ill. 2d at 67; *Mack*, 238 Ill. App. 3d at 102.) Guideposts to be considered in assessing whether the exception is properly applied include whether: (1) the statement was made spontaneously or shortly after the crime to a close acquaintance; (2) the statement was corroborated by other evidence; (3) the statement was self-incriminating and a declaration against interest; and (4) there was an adequate opportunity for cross-examination of the declarant. (*Chambers*, 410 U.S. at 300-01, 35 L. Ed. 2d at 312, 93 S. Ct. at 1048; *Bowel*, 111 Ill. 2d at 67.) Again, because the issue is one of the admissibility of evidence, the trial court must not be reversed absent a clear showing of an abuse of discretion. *People v. Ward* (1984), 101 Ill. 2d 443, 455-56, 463 N.E.2d 696.

■ The four factors set out by *Chambers* certainly do not support defendant's position. First, Grant's grand jury statements, made on April 5, 1991, were not made at a time spontaneously or shortly after the commission of the crime and were not made to a close acquaintance.

Second, Grant's version of events is not well corroborated. The fact that Grant's testimony matches the defendant's version of events is not a particularly strong corroborating factor as both men were friends and potential suspects in the crime. Both men knew Regina Newton, both men went with her to the place where she was murdered and both men left the scene together after her death. Police testimony and testimony from the Schells' grand jury hearings indicated that Grant and the defendant discussed their stories before speaking with the police. It is not surprising, therefore, that their stories are similar.

Third, Grant's statements to the grand jury are not "in a very real sense" incriminating or "unquestionably" against Grant's interest, as was the case with the statements at issue in *Chambers*. (See *Chambers*, 410 U.S. at 301, 35 L. Ed. 2d at 312, 93 S. Ct. at 1048-49.) Although Grant's statements place him near the scene of the murder, and could be characterized as being inculpatory in this respect, they are also statements which are clearly self-serving in that they indicate Grant had nothing to do with Newton's death.

Finally, defendant argues that the fourth consideration under *Chambers*, whether the State has had an adequate opportunity to cross-examine Grant, should not be applied to this case or should be applied in his favor because Grant's testimony to the grand jury was offered by the State. We do not agree. As we have already discussed, simply because the State tenders a witness to the grand jury does not necessarily mean that the State has had a meaningful opportunity to challenge that witness' version of events. Our consideration of the particular facts in this case, and review of Grant's grand jury testimony itself, leads us to conclude that the State's motive in presenting Grant's testimony to the grand jury was significantly different than its motive would have been in confronting Grant at defendant's trial. This means that the State had not been given a meaningful opportunity to cross-examine Grant.

Briefly stated, all four of the factors discussed by the *Chambers* decision weigh against admitting Grant's grand jury testimony into evidence as a declaration against penal interest. Accordingly, we do not view Grant's statements to the grand jury as having the indicia of reliability necessary to require that they be admitted under that exception. The court committed no error in denying their admission.

We next turn our attention to defendant's claim that the trial court improperly admitted irrelevant and prejudicial statements contained in the Schells' grand jury testimony. Specifically, defendant claims that the trial court improperly failed to redact the Schells' grand jury testimony which contained prior consistent statements, double hearsay and evidence of other crimes.

Section 115—10.1 of the Code of Criminal Procedure of 1963 (725 ILCS 5/115—10.1 (West 1994)) provides that prior inconsistent statements of a witness may be admitted into evidence as an exception to the hearsay rule if: (1) the statement is inconsistent with the witness' testimony at trial; (2) the witness is subject to cross-examination; and (3) the statement was made under oath at a trial, hearing or other proceeding. Defendant does not dispute that this statutory exception could properly have been used by the State to put into evidence those portions of the Schells' grand jury testimony which were inconsistent with their trial testimony. Defendant claims, however, that the court's decision to put into evidence and to send back with the jurors during their deliberations the entire and unredacted grand jury testimony of all four Schells amounts to reversible error. The State asserts that the trial court did not abuse its discretion in admitting the unredacted transcripts, relying upon *People v. Salazar* (1988), 126 Ill. 2d 424, 456-58, 535 N.E.2d 766.

In *Salazar*, our supreme court held that section 115—10.1 does not require the trial court to make a "quantitative or mathematical analysis" as to whether all of the witness' prior statements are "inconsistent" under the rule in order for them to be admissible, and that the court has broad discretion in determining the extent to which the exception can be used to put into evidence former testimony which would otherwise be hearsay. In *Salazar*, for example, the trial court allowed the State to put into evidence a witness' entire tape-recorded statement under section 115—10.1, even though the inconsistencies between the tape and the witness' in-court testimony were found to be "few." The court justified the admission of this evidence, in part, by noting that the facts of each particular case are unique and that the legislature, in passing the statute, meant for the trial court to have broad leeway in interpreting the rule. The court noted, in some cases, "a mere tendency to be inconsistent will be enough" while, in other cases, "more than a mere tendency would be needed." *Salazar*, 126 Ill. 2d at 458.

■ The State argues that the court's opinion in *Salazar* is sufficient to justify the ruling by the court below. We are unpersuaded. Although the *Salazar* opinion indicates that the trial court's discretion under section 115—10.1 is broad, it does not indicate that section 115—10.1 can be used by the State to admit wholly irrelevant or unfairly prejudicial evidence. In this case, for example, there is a host of information contained in the grand jury testimony which should have been excluded and which had the tendency to unfairly prejudice the defendant's case. The most egregious abuse of discretion occurred when the State introduced through grand jury testimony evidence that implicated defendant in other murders.

The established rule of law is that evidence of other crimes or offenses is not admissible for purposes of showing that the defendant has a disposition or propensity to commit crime. (*People v. McKibbins* (1983), 96 Ill. 2d 176, 449 N.E.2d 821.) In determining whether evidence of other crimes may be admitted for some other proper purpose, such as to prove *modus operandi,* intent, motive or identity, the trial court is charged with weighing the probative value of the tendered evidence against its prejudicial effect upon the defendant. (*People v. Stewart* (1984), 105 Ill. 2d 22, 473 N.E.2d 840.) The record indicates clearly that the trial court failed to do so in admitting the Schells' grand jury testimony *in toto.* Included in the testimony from Joanne Schell was that defendant had told her that he was going to kill a guy on Wednesday and that he and Grant had previously killed three men. This evidence was extremely prejudicial, particularly in a murder trial, and had no probative value whatsoever to the issues before the court. Nonetheless, the trial court ruled that it was just "boasting" and that the jurors would likely see this for what it was. This conclusion by the trial court ignores the proper legal standard of admissibility. In our view, the admission of this evidence was clear and reversible error.[1] (See *People v. Henderson* (1990), 142 Ill. 2d 258, 568 N.E.2d 1234; *People v. Gregory* (1961), 22 Ill. 2d 601, 177 N.E.2d 120.) On remand, any reference to other murders must not be admitted into evidence.

We must also conclude that the trial court abused its discretion in not redacting other portions of Joanne, Robert, Maggie and Jennifer Schell's grand jury testimony. The transcripts of the Schells' grand jury testimony contained very few prior inconsistent statements. Most of the testimony was either consistent or contained evidence on matters about which the declarant was never questioned at trial. The sheer volume of consistent or new testimony contained in these transcripts and the court's failure to redact anything from the transcripts, even statements which were clearly inadmissible and unfairly prejudicial to defendant's case, compels us to conclude that the trial court failed to exercise any discretion in ruling on

---

[1]We also note that the court later compounded its error by instructing the jury with Illinois Pattern Jury Instructions, Criminal, No. 3.13 (3d ed. 1992). This instruction relates to the proper use by the jury of defendant's prior convictions in assessing his credibility. In light of the fact that the jury received no evidence whatsoever that the defendant had any prior convictions, references to other crimes committed by the defendant during the course of the trial could not help but to confuse the jurors, leading them to believe that defendant had been convicted of the murders referred to in Joanne Schell's testimony.

defendant's request that these transcripts be redacted. In addition to improperly bolstering the Schells' trial testimony, the admission of these transcripts was improper because they contained double hearsay and evidence of other crimes. Defendant's brief contains over four pages of summarized grand jury testimony put into evidence by the State under section 115—10.1. Our review of this testimony indicates that almost all of it should have been excluded as it does not fall within the unambiguous statutory exception. On remand, the trial court is directed to admit only those portions of the grand jury transcripts which can reasonably be characterized as "inconsistent" with trial testimony, in conformity with the plain language of section 115—10.1.

For the foregoing reasons, the judgment of the circuit court of Cook County is reversed and the cause remanded for further proceedings.

Reversed and remanded.

McNAMARA, P.J., and EGAN, J., concur.