**Ronald H. BERG, Petitioner,**

v.

**Paul J. MORRIS, Warden, Respondent.**

**Civ. No. S–79–1 LKK.**

United States District Court,
E. D. California.

Jan. 18, 1980.

─────────

Quin Denvir, State Public Defender, Peter R. Silten, Deputy Public Defender, San Francisco, Cal., for petitioner.

George Deukmejian, Atty. Gen., State of Cal., Charles J. James, Deputy Atty. Gen., Sacramento, Cal., for respondent.

## OPINION AND ORDER

KARLTON, Judge.

Petitioner, an inmate of Folsom State Prison, Represa, California, has filed an application for a writ of habeas corpus. He challenges the constitutionality of his Solano County Superior Court conviction of robbery (California Penal Code § 211), and false imprisonment (California Penal Code § 236), asserting that he was denied a fair trial because of the trial judge's conduct in regard to one witness. This matter is now before the Court on an order to show cause, respondent's return and petitioner's traverse having been filed.

Petitioner contends that he was deprived of his right to a fair trial as the result of the trial court's improper conduct toward defense witness Jackie Fryar. After reviewing and considering the application for the writ of habeas corpus, respondent's return, petitioner's traverse and the record of petitioner's trial, this Court has concluded that petitioner's request for federal habeas corpus relief should be granted.

### I

### FACTS

On October 23, 1975, the Traveler's Inn in Vallejo, California, was robbed by two men, one wearing a blue jacket, the other wearing a tan coat and a ski mask and carrying a gun. After removing the cash from the drawer, the latter man took Lois Covey, the motel clerk, to the back of the office and tied her up.

Fifteen minutes after the robbery, a California Highway Patrol officer stopped a car driven by Jackie Fryar for a traffic violation. Petitioner was in the passenger seat of the car. The officer noticed a revolver covered by a tan coat. A further search of the vehicle uncovered a ski mask. Responding to a request from the Vallejo Police Department, the Highway Patrol officers took petitioner and Jackie Fryar back to the Traveler's Inn for identification by the motel clerk. As soon as the suspects were brought into the motel office, Ms. Covey exclaimed that she hadn't expected to see them back so soon. She explained in court that although petitioner's face had been partially covered by a ski mask, she was able to identify him by his cheekbones, eyes, nose and forehead, which the mask had not covered. At trial she identified the taller man as petitioner Ronald Berg and the shorter man in the blue jacket as Jackie Fryar.

Just prior to petitioner's trial, defense counsel noted that the trial judge was the judge who sentenced co-participant Jackie Fryar, following his guilty plea. Counsel voiced his concern that any memory the judge might have of statements made by Fryar during the sentencing hearing might be prejudicial to the petitioner in the upcoming trial. The judge assured counsel that he had no recollection of the proceedings and, although something might jog his memory, he doubted that such an event would occur. He stated: "I don't know exactly how it might possibly affect the course of this trial anyway. The jury is going to decide the facts and it would be, of course, relevant to any motion for a new trial when the judge does it as a 13th juror, but at this stage of the proceeding, I can't see how it would affect that."

As part of its case in chief the defense called as a witness Jackie Fryar, then on probation at the Delancey Street Foundation. Just after Mr. Fryar took the stand and stated that he had been convicted of the Traveler's Inn robbery, the judge called a recess, indicating that he wanted a brief conversation in chambers with counsel and the witness. The following conversation transpired:

THE COURT: Mr. Fryar, I'm told that you would have reason to remember me.

THE WITNESS: Yes.

THE COURT: And I would infer from what you have just stated to be your current address, that it was I who made the probation order that included a provision that you commit yourself to Delancey as a part of probation?

THE WITNESS: Yes.

THE COURT: I have no idea why you are here as a witness, but I want to be sure that you understand that if you tell anything but the truth, it is possible that your probation will be revoked, okay?

THE WITNESS: (Thereupon the Witness nodded his head).

Jackie Fryar then took the stand and testified that he was armed with a .44 Magnum pistol during the robbery. Fryar claimed that his co-participant in the robbery was a person named Billy or Jim, not Ronald Berg. After the robbery, Fryar testified, his co-participant went to an apartment house near the motel, instructing Fryar to obtain some drugs and to return for him. Fryar then stuffed the guns, coat and mask under the seat and headed toward Interstate 80. As he started onto the ramp, he stopped to pick up a hitchhiker who looked familiar and who turned out to be Ronald Berg, with whom he had attended grammar school.

On cross-examination, the District Attorney read a portion of the transcript of Fryar's guilty plea hearing, at which time Fryar had testified that he had not been armed during the robbery. Fryar admitted to having so testified. The Court then called a recess, musing that "perhaps it would be better to wait until the completion of this Witness' testimony before I take the action that appears to be necessary. . . ."

During a conference in chambers, in the presence of counsel, the defendant, the witness and Alice Watson, the legal secretary for one of the Delancey Street attorneys, the judge said:

THE COURT: I did the best I could. I thought that there could be some monkey business, so before he testified I admonished him that I would expect that he would tell the truth and I have forgotten the precise words I used, but I think it was pretty clear, that if he didn't probation would be revoked, that he would be removed from Delancey Street and sent to prison for the robbery. The record will show exactly what I said.

It's a little late now, I think he should be counseled. Whatever the truth is, I'll still give him the opportunity to tell it and specifically what I'm referring to, there is an implication in all that has occurred, that the Defendant Berg may have suborned perjury. Your Client can dig himself out if he so chooses, but I don't want anything but the truth.

The court then suggested that Ms. Watson talk to Mr. Fryar; they left chambers.

After lunch there was another conference in chambers, outside of the presence of Jackie Fryar but with counsel, Ms. Watson, and Paul Ligda, the Solano County Public Defender. The judge outlined what had transpired and highlighted the discrepancies between Fryar's testimony as he gave it on the stand and as he gave it at his guilty plea and parole revocation hearings. He told Mr. Ligda that Fryar needed to talk to an attorney. Mr. Ligda left chambers to consult with Mr. Fryar. Upon his return, the following exchange took place:

THE COURT: You can just tell him that if he doesn't tell the truth, as we know the truth now to be in view of his prior sworn testimony, under the circumstances of this trial he'll not only suffer a revocation of probation for the felony robbery, but perjury charges will be filed against him.

MR. LIGDA: Well, I don't know what the truth is, whether it's before or after.

THE COURT: I'm satisfied that the truth is as he stated before the Parole Board and that he's presently under great fear of this Defendant's reputation as a prominent member of the Arian [sic] Brotherhood.

When court reconvened, Fryar admitted that he was lying about the gun but reiterated his statement that Bill, not Ronald Berg, was his co-participant. Immediately thereafter, the court was adjourned for the weekend and the judge ordered Jackie Fryar detained over the weekend.

Mr. Ligda communicated with Mr. Fryar before the latter completed his testimony, telling Fryar that Judge Sherwin did not believe the story that Fryar was telling on the stand and that if Fryar persisted in that story, his probationary status would be in danger. See Declaration of Paul Ligda, Exhibit B, Petitioner's Application.

Before trial resumed Monday morning, defense counsel moved for a mistrial, basing the motion on the Court's treatment of the witness Jackie Fryar. The judge denied the motion.

Fryar took the stand again in order to complete his testimony. The District Attorney attempted to impeach Fryar who steadfastly denied making a prior inconsistent statement at his parole revocation hearing.[1] The District Attorney then said, "I'd like to give you a chance right now to change your testimony, sir." Only then did Fryar implicate Berg, feeling that if he did not do so, he would be sent to prison. See Declaration of Jackie Fryar, Exhibit A, Petitioner's Application.

## II

### COERCION OF WITNESS

"Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi* (1973) 410 U.S. 284, 302, 93 S.Ct. 1038, 1049, 35 L.Ed.2d 297; See also *Faretta v. California* (1975) 422 U.S. 806, 818, 95 S.Ct. 2525, 45 L.Ed.2d 562; *United States v. Nixon*

(1974) 418 U.S. 683, 711, 94 S.Ct. 3090, 41 L.Ed.2d 1039; *Webb v. Texas* (1972) 409 U.S. 95, 93 S.Ct. 351, 34 L.Ed.2d 330; *Washington v. Texas* (1967) 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019. The right is firmly based upon both the Sixth Amendment's compulsory process provision and the Due Process Clause of the Fourteenth Amendment, and is thus applicable to the states. *Washington v. Texas, supra* at 17–18, 87 S.Ct. 1920. As the Supreme Court has explained:

> "The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process." *Washington v. Texas, supra* at 19, 87 S.Ct. at 1923.

While this basic right is violated by a state statute that simply forbids the presentation of certain types of witnesses (*Washington v. Texas, supra*) it is also violated where judicial misconduct (*Webb v. Texas, supra*) or prosecutorial misconduct (See, e. g. *United States v. Morrison* (3d Cir. 1976) 535 F.2d 223) leads to the same result: interference with the right to present the testimony of witnesses. The initial question before this Court, accordingly, is whether the conduct of the trial judge so interfered with the petitioner's right to present witnesses in his own defense as to amount to a denial of due process. I conclude that it did.

---

1. No transcript of the witness' parole revocation hearing was introduced into evidence. Apparently the People were relying on "notes" or "memoranda" relating to the hearing. However, in an even more strange twist after the witness recanted his trial testimony, the People were permitted to call "in rebuttal" two parole officers who, apparently relying on the same notes, testified as to Fryar's statements at the

hearing. I cannot understand what was being "rebutted" at that stage of the proceeding, the witness having now committed himself to a version of the facts consistent with the testimony at the parole revocation hearing. In any event, this procedure is not objected to in this proceeding and will not be further considered by the Court.

The Supreme Court faced a similar question in *Webb v. Texas, supra.* In that case, the trial judge admonished the only defense witness, a man with a criminal record:

"Now you have been called down as a witness in this case by the Defendant. It is the Court's duty to admonish you that you don't have to testify, that anything you say can and will be used against you. [¶] If you take the witness stand and lie under oath, the Court will personally see that your case goes to the grand jury and you will be indicted for perjury and the liklihood [sic] is that you would get convicted of perjury and that it would be stacked onto what you have already got, so that is the matter you have got to make up your mind on. If you get on the witness stand and lie, it is probably going to mean several years and at least more time that you are going to have to serve. It will also be held against you in the penitentiary when you're up for parole and the Court wants you to thoroughly understand the chances you're taking by getting on that witness stand under oath. You may tell the truth and if you do, that is all right, but if you lie you can get into real trouble. The court wants you to know that. You don't owe anybody anything to testify and it must be done freely and voluntarily and with the thorough understanding that you know the hazard you are taking.

The Supreme Court, in reversing the judgment of conviction, explained:

"The trial judge gratuitously singled out this one witness for a lengthy admonition on the dangers of perjury. But the judge did not stop at warning the witness of his right to refuse to testify and of the necessity to tell the truth. Instead, the judge implied that he expected Mills to lie, and went on to assure him that if he lied, he would be prosecuted and probably convicted for perjury, that the sentence for that conviction would be added on to his present sentence, and that the result would be to impair his chances for parole. At least some of these threats may have been beyond the power of this judge to carry out. Yet, in light of the great disparity between the posture of the presiding judge and that of a witness in these circumstances, the unnecessarily strong terms used by the judge could well have exerted such duress on the witness' mind as to preclude him from making a free and voluntary choice whether or not to testify. . . . [¶] In the circumstances of this case, we conclude that the judge's threatening remarks, directed alone at the single witness for the defense, effectively drove that witness off the stand, and thus deprived the petitioner of due process of law under the Fourteenth Amendment." *Id.* 409 U.S. at 96–97, 93 S.Ct. at 353.

Analogous cases involving prosecutorial intimidation of witnesses follow the *Webb* holding. Thus threats of criminal prosecution (*United States v. Morrison* (3d Cir. 1976) 535 F.2d 223), or merely telling a defense witness that he would have "nothing but trouble" if he testified (*United States v. Hammond* (5th Cir. 1979) 598 F.2d 1008, 1012), have supported findings of witness coercion in violation of the due process clause. See also *United States v. Thomas* (6th Cir. 1973) 488 F.2d 334. Similarly, coercion in violation of the due process clause has been found where a potential witness was arrested and incarcerated, apparently in violation of law, following the receipt of a defense subpoena. *Bray v. Peyton* (4th Cir. 1970) 429 F.2d 500, 501.

In this Circuit, "threatening and . . . coercive language indicating the court's expectation of perjury" establishes a *Webb* violation. See *United States v. Harlin* (9th Cir. 1976) 539 F.2d 679, 681, cert. den. 429 U.S. 742, 97 S.Ct. 362, 50 L.Ed.2d 313. In *Harlin*, the court found no coercion in the trial judge's statement to a co-defendant's counsel that he assumed counsel had warned the co-defendant of the dangers of perjury and that the court could take apparent perjury into account. *Id.* at 680.

Under these standards, it is clear that judicial coercion denied petitioner his right to present the testimony of his witness. Twice the trial judge warned Jackie

Fryar that his probation would be revoked if the truth were not told. The judge indicated that he did not consider Fryar's testimony at the trial to be the truth. Finally, the judge had Fryar jailed over the weekend. The threat of revocation of probation, as well as of perjury prosecution, coupled with detention (which would serve only to underscore the threat of revocation of probation) and a clear indication of which version of the facts was considered true by the judge, clearly could preclude a witness from making a free and voluntary choice of whether or not to stick to his trial testimony. Indeed, following these judicial statements and acts, Fryar changed his testimony and admitted that petitioner was his accomplice. The result was not merely that the witness was driven from the stand, as in *Webb*, but, immeasurably more damaging, the witness recanted in the jury's presence.

■ Respondent contends that the trial judge's conduct was not necessarily the cause of Fryar's change of testimony. It is difficult for this Court to imagine any other plausible explanation. Such hypothesizing is unnecessary, however, since petitioner need not establish direct or exclusive causation. In *Webb*, the Supreme Court merely found that the record "strongly suggests that the judge's comments were the cause . . . ." Id., 409 U.S. at 97, 93 S.Ct. at 353; See also *Bray v. Peyton, supra* at 501. It would be an understatement to claim in the present case that the facts "strongly suggest" judicial coercion.[2]

Respondent raises two arguments, however, to support denial of habeas corpus relief. First, respondent argues that such relief is simply inappropriate in this type of case. Second, respondent argues that the error was not prejudicial, and thus the relief should be denied.

2. On appeal, the California Court of Appeal, in an unpublished opinion, also found coercion but did not reverse because it concluded that the error was not prejudicial.

3. Respondent relies on *Richardson v. Stone* (N.D.Cal.1976) 421 F.Supp. 577. In that case petitioner alleged that statements taken in violation of *Miranda* were erroneously admitted at trial. The court held that *Stone* controlled because petitioner had made no claim of inno-

## III

### HABEAS CORPUS RELIEF

■ Initially, respondent argues that *Stone v. Powell* (1976) 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067, which held that federal habeas corpus relief is unavailable to redress violations of the Fourth Amendment's exclusionary rule where state tribunals have provided a full and fair opportunity to litigate Fourth Amendment claims, bars relief in the present case. Neither precedent nor policy requires this extension of *Stone*, thus I reject this argument.

By its own terms, the *Stone* holding was limited to Fourth Amendment claims. Id. at 494 n.37, 96 S.Ct. 3037. Subsequent Supreme Court cases have declined to extend the reach of *Stone*. See *Rose v. Mitchell* (1979) 443 U.S. 545, 99 S.Ct. 2993, 61 L.Ed.2d 739; *Jackson v. Virginia* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Lower courts have generally found *Stone* inapplicable to Fifth and Sixth Amendment claims. See, e. g. *Swicegood v. Alabama* (5th Cir. 1978) 577 F.2d 1322, 1325; *United States ex rel. Sanders v. Rowe* (N.D.Ill. 1978) 460 F.Supp. 1128, 1145.[3]

The rationale of *Stone* is based on concerns peculiar to the court-created exclusionary rule: the perceived minimal deterrent effect of the rule when applied during collateral review of a case, and the exclusion of highly probative evidence with resulting "disruption" of the truth-finding process. *Stone v. Powell, supra*, 428 U.S. at 486, 489–490, 96 S.Ct. 3037.

By contrast, coerced witness testimony raises serious questions about the integrity of the fact finding process, and implicates

cence and because his claim did not go to the basic justice of his incarceration. This result is severely undermined by the Supreme Court's decisions in *Jackson v. Virginia, supra*, and *Rose v. Mitchell, supra*. Whatever continued vitality *Richardson* has, it is further weakened by the fact that the court's conclusion is dicta, for it held that there had been no *Miranda* violation. See *Richardson v. Stone, supra* at 579. This court declines to follow *Richardson*.

values basic to civilized notions of fairness and due process. Cf. *Blackburn v. Alabama*, 361 U.S. 199, 206–207, 80 S.Ct. 274, 4 L.Ed.2d 242; See also *Rose v. Mitchell, supra*, 99 S.Ct. at 3000. Unlike violation of the judicially created exclusionary rule, this violation must be subject to collateral review because it raises basic questions about judicial integrity and the administration of justice. See *Rose v. Mitchell, supra* at 3004. Indeed, in a sense the rationale of *Stone* supports review. The effect of coercion of a witness is to deprive the trier of fact of highly probative evidence and consequently to disrupt the truth finding process. In the final analysis it is for the jury and not the judge to determine the truthfulness of testimony.

Accordingly, I hold that federal habeas corpus relief is available to redress such due process violations.

IV

STANDARD OF REVIEW

 Finally, respondent argues that habeas corpus relief should be denied because the error was not prejudicial. Essentially, respondent argues that the evidence of guilt was so overwhelming that the error was "harmless beyond a reasonable doubt." *Chapman v. California* (1967) 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705. Assuming, for the moment, that the *Chapman* test applies, I cannot "declare a belief" that the error was harmless. Although the evidence against petitioner was substantial, the error prejudiced his case in two ways: it denied him the only corroboration for his alibi defense; and, as opposed to a mere error of exclusion, the unexplained recanting by the witness before the jury was in fact inculpatory.

Speculation as to how a jury would have reacted to the uninterrupted testimony of the witness is an exceedingly sensitive endeavor even in the "ordinary" case when the issue is merely the introduction of improper evidence. There the reviewing court's process is to excise the improper evidence and, viewing the remaining evidence as a whole, determine whether the evidence was so overwhelming that it may say, beyond a reasonable doubt, that the introduction of such evidence could not affect the outcome.[4]

Here, however, no such "simple" process may be followed. The Court must first excise the inculpatory evidence, include the exculpatory evidence, assess the effect of the recantation, and speculate as to the effect of rebuttal. In effect the Court must invent a trial which did not occur and assess what the jury would do if it had occurred. Such speculation is appropriate for a psychic, not a Court.

The State Court of Appeals recognized that the trial judge's conduct was coercive, nevertheless it refused to overturn the conviction. Brushing aside the considerations which have given this Court pause, it stated:

"Assuming Fryar had given consistent exculpatory testimony at trial, he would have still been subject to impeachment by the prosecution based on his earlier statements at his sentencing hearing; moreover, these statements were admissible for their truth. (Evid.Code, § 1235). Although it is unclear whether Fryar named appellant, he did give a description of his accomplice which matched appellant. Thus, the prejudicial effect of the trial court's error was slight; at most, it may have caused Fryar to impeach himself at trial. The prosecution, as it showed at trial, had ample means with

4. In formal logic the process is known as counterfactual conditional, i. e. a conditional proposition whose antecedent is known to be false. Such propositions present enormously complex problems (see, e. g. The Encyclopedia of Philosophy, p. 212, ff. The MacMilliam Co. (1967)). Nonetheless, counterfactual conditionals are fundamental to various notions inherent in scientific thought (see especially, Carnap, "Testability and Meaning", *Journal of Philosophy of Science*, Vol. 3 (1936) pp. 419–471; Vol. 4 (1937) pp. 1–40). As work-a-day judges and lawyers, we need not pause overly long over such problems, though it is not inappropriate that we occasionally ask ourselves what the tests we are asked to apply mean.

which to discredit Fryar's testimony. [¶] In addition, it is clear that there is evidence other than Fryar's testimony which supports the conviction, including an identification of appellant by the victim. Other evidence consisted of appellant's arrest by police just fifteen minutes after the robbery in a car with an identified participant, money stolen from the motel, and a gun and ski mask similar to those used in the robbery."

Even taking the Court of Appeal's brusque approach, however, the case is hardly so strong as to permit one to conclude, beyond a reasonable doubt, that the error was harmless.

While I will resist a shard-by-shard examination, brief examination is appropriate.

First, the Court of Appeal asserts that the prosecutor "had ample means with which to discredit Fryar's testimony." Apparently, the Court was referring to the parole officer's "notes" of the revocation hearing. While surely this was significant evidence, the fact is that there appears to be no transcript of that hearing. Moreover, defense counsel had a tape recorded statement by Fryar which was consistent with his first version. To put it bluntly, I cannot know how all of this affected the jury without indulging in fortunetelling—a process I do not believe any Court should be required to undertake.

The identification witness' testimony had equal problems. The robber who is identified as defendant was masked, and the witness first identified the defendant when the defendant was shown to the witness in the company of the unmasked robber in an otherwise single person "showup" in handcuffs and surrounded by uniformed officers—hardly the most convincing of circumstances.

Finally, as to the evidence of defendant being in a car with an identified participant, the stolen money and one ski mask and gun, its prejudicial effect depends on the jury's disbelief of Fryar's original testimony—which, of course, they were almost required to do given his on-the-stand recantation.

It is not for the Court to weigh or reweigh the testimony—I need only ask whether I am convinced beyond a reasonable doubt that the coercion did not ·affect the verdict. Under the circumstances, I cannot so ·find.

■ But I need not indulge in such uncertain speculation, for I have concluded that the constitutional rights involved in the present case are "so basic to a fair trial that their infraction can never be treated as harmless error . . . ." *Chapman, supra* at 23, 87 S.Ct. at 827. Accordingly, reversal is required without an examination of prejudice. My conclusion is supported by precedent and constitutional principle.

Although the Supreme Court did not expressly rule on the standard of reversal in *Webb v. Texas, supra,* it reversed despite, as the dissent observed, overwhelming evidence of guilt. Id., 409 U.S. at 99, 93 S.Ct. 351. Since this decision, four circuits have held that coercion of defense witnesses requires reversal without requiring a showing of prejudice. See *United States v. Hammond* (5th Cir. 1979) 598 F.2d 1008; *United States v. Morrison* (3d Cir. 1976) 535 F.2d 223, 228; *United States v. Thomas* (6th Cir. 1973) 488 F.2d 334, 336; *Bray v. Peyton* (4th Cir. 1970) 429 F.2d 500, 501.[5]

No uniform rationale has been adopted by the courts in determining which rights are "so basic to a fair trial" that their violation requires per se reversal. Nonetheless, an examination of the evolving list of "per se" categories is indicative of the underlying fundamental concerns. It has long been established that automatic reversal is required where a coerced confession is introduced into evidence against a criminal defendant (*Haynes v. Washington* (1963) 373 U.S. 503, 518, 83 S.Ct. 1336, 10 L.Ed.2d

---

5. Although the Ninth Circuit has not ruled on this point, in the past it has reversed convictions in somewhat analogous situations without examining the question of prejudice. See e. g. *United States v. Mendez-Rodriguez* (9th Cir. 1971) 450 F.2d 1, 5 (witnesses made unavailable for interview by prosecution).

513; *Payne v. Arkansas* (1958) 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975). Bias, or conflict of interest on the part of the judge has required such reversal (*Ward v. Monroeville* (1972) 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267; *Tumey v. Ohio* (1927) 273 U.S. 510, 47 S.Ct. 437, 71 L.Ed. 749). Denial of the assistance of counsel (*Holloway v. Arkansas* (1977) 435 U.S. 475, 98 S.Ct. 1173, 55 L.Ed.2d 426) or the right to self-representation (*Faretta v. California* (1975) 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562; *Bittaker v. Enomoto* (9th Cir. 1978) 587 F.2d 400, cert. 441 U.S. 913, 99 S.Ct. 2013, 60 L.Ed.2d 386) also requires automatic reversal. Recently, the Supreme Court reaffirmed the rule of automatic reversal in cases of discrimination in the selection of a grand jury. *Rose v. Mitchell, supra.*

Each of these cases involve fundamental rights that implicate either the integrity of the judicial process (e. g. judicial bias, discrimination, self-representation), or the validity of the fact finding process (e. g. coerced confession, inadequate representation). Both of these factors are present in the instant case. The right to present witnesses free from judicial coercion must surely be "so basic to a fair trial that [its violation] can never be treated as harmless error . . . ." *Chapman, supra,* 386 U.S. at 23, 87 S.Ct. at 827.

This conclusion is buttressed by the fact that such a violation will almost always be harmful, yet difficult to assess. *United States v. Hammond, supra* at 1013. These concerns are especially appropriate in the present case where the fact finding process is undermined in two distinct ways. First, the defendant is deprived of presenting his case to the jury and, second, prejudicial evidence is presented to the jury. Finally, as I have indicated, the net result precludes reasoned judgment by a reviewing court of the effect of the error.

Respondent argues, however, that while automatic reversal may be required in some cases, it is never required where the record is complete, that is, where the record discloses what in fact the defendant's witness would have testified but for the coercion. This novel theory finds no express support in the case law either in coerced witness cases,[6] or in other automatic reversal cases. Indeed, in coerced confession cases, perhaps the archetype of the per se reversal cases, the reviewing court as well as the jury usually has a "complete" record—the coerced confession and defendants' in-court renunciation—yet reversal is still required. See, e. g. *Payne v. Arkansas, supra.* In the coerced confession cases, reversal is required because "no one can say what credit and weight the jury gave to the confession." Id., 356 U.S. at 568, 78 S.Ct. at 850, and because such confessions violate the "strongly felt attitude of our society that important human values are sacrificed." *Jackson v. Denno* (1964) 378 U.S. 368, 386, 84 S.Ct. 1774, 1785, 12 L.Ed.2d 908, quoting *Blackburn v. Alabama,* 361 U.S. 199, 206–207, 80 S.Ct. 274, 4 L.Ed.2d 242. The same is true in coerced witness cases.

The respondent's theory would lead to absurd results. Automatic reversal would be required in cases where the witness does not testify at all, yet not be required where the witness testifies and then changes his story. Yet it is clear that the latter case is more prejudicial to a defendant who not only loses the benefit of exculpatory evidence, but also ends up with additional inculpatory evidence before the trier of fact.

Finally, in a sense, the record can never be deemed "complete" where a witness has been coerced. The record is always corrupted; the integrity of the fact finding process always undermined.

The problem is even more poignant when the source of the coercion is the trial judge, no matter how well motivated the trial judge's action may in fact be; ominous questions about judicial fairness and neutrality are inevitably raised, and public con-

---

**6.** Thus in *United States v. Hammond, supra,* the Court reversed notwithstanding the fact that the record disclosed the substance of the witness' testimony in the form of a stipulation.

Id. at 1012. In the other cases requiring reversal, little imagination is necessary to discern the substance of the exculpatory testimony denied to the defendants.

fidence in the judiciary of necessity is undermined.

 I therefore conclude that reversal in the present case is required as a matter of constitutional law. Because this issue is appropriately raised in a habeas corpus proceeding, IT IS THEREFORE ORDERED that petitioner's application for a writ of habeas corpus is granted. Petitioner must be released from state custody within 30 days unless a new action is commenced by that time and pretrial detention is ordered.

IT IS SO ORDERED.