*978
 
 OPINION
 

 Per Curiam:
 

 In this appeal, appellant contends that the district court erred in denying her post-conviction petition for a writ of habeas corpus. Specifically, appellant asserts that alleged juror misconduct during the trial, along with post-trial recantations of material witnesses, necessitate a new trial. For the reasons stated below, we disagree and conclude that the district court properly denied appellant’s petition. As our review of the district court’s order requires some familiarity with the facts underlying appellant’s conviction, the pertinent facts are provided below.
 

 FACTS
 

 Prior to his death, Floyd Callier (“Floyd”) and his wife, Ethel Louise Callier (“Louise”) frequently quarreled. On or about February 17, 1981, Floyd was killed. At approximately 1:00 a.m. on the morning of February 18, 1981, witnesses observed a
 
 *979
 
 fire to the west of the Rainbow Expressway in Clark County. They also noticed a dark green or blue Ford Country Squire station wagon with brown paneling slowly travelling away from the direction of the fire. According to the witnesses, the station wagon’s driver’s side taillight cover was cracked. Upon approaching the fire, the witnesses noticed that a trail of ignited gasoline, still flaming, led to a red pickup truck. The truck was engulfed in flames, its doors were open, and its gas cap was missing.
 

 After being summoned to the scene, the police discovered blood and a .38 caliber cartridge on the truck’s floorboard. They did not, however, find a corpse. The police determined that the truck was registered to Floyd, and, at approximately 2:00 a.m. that morning, they visited his residence. Louise answered the door wearing a robe over jeans, and, according to the police, she appeared alert and did not seem to be “hit hard” by the news.
 

 At 8:00 a.m. on February 18, 1981, Louise reported Floyd missing; she informed the police that she had last seen Floyd at 8:00 p.m. on February 17, 1981, and that he had told her that he was going for a drive. In addition, Louise indicated that she did not know of anyone who owned a dark green or blue Ford Country Squire station wagon with side paneling.
 

 Several weeks later, one of Louise’s friends, Patrick Maxwell, informed her that she would not be able to collect on any insurance policies unless Floyd’s body was discovered or he was presumed dead after seven years. Thereafter, Louise informed this friend and others that she had gone to several bars and had asked patrons if they had seen Floyd. According to Louise, one patron had seen a human head lying in some water by the side of the road. In addition, Louise stated that she had heard a boy report, over a CB radio, that he had seen a human head while riding his bicycle in the desert.
 

 Louise also consulted Reverend Margaret Schmidt, a pastoral consultant and “channel of the Lord.” Reverend Schmidt had a vision of a body in two parts — one part near a road on high ground and one part in a gully with water. In a previous session that took place before Floyd disappeared, Louise allegedly asked Reverend Schmidt whether she would “get off or not.”
 

 On April 14, 1981, Louise and her friend Patrick Maxwell traveled to an area off of Pabco Road with directions that Louise said she got from the boy on the CB radio. In an embankment, Maxwell found a human head lying in water. Maxwell called Louise back to the car, drove her home, and told her what he had seen. He also stated that he did not think that the head was Floyd’s. Maxwell then telephoned the police, over Louise’s objection that she did not want to be involved.
 

 
 *980
 
 The head was identified by dental records as Floyd’s. According to the coroner’s office, Floyd had suffered a fractured jaw and a .38 caliber gunshot wound, which caused his death. On April 15, 1981, Louise requested a death certificate from the coroner’s office. On the same day, Floyd’s decapitated body was discovered in Lee Canyon by a student on a geology field trip. Floyd’s hands were also missing and were never found. Floyd’s body had suffered a gunshot wound to the back; the bullet was never recovered.
 

 Louise and her father, Harry Belvill (“Harry”) were subsequently charged with Floyd’s murder. The first trial, held before Judge Mendoza, ended in a mistrial. At the subsequent trial, Louise’s daughter, Kathleen Hughes-Cano (“Kathleen”), who was then seventeen years old, testified for the prosecution. Kathleen stated that on the night of February 17, 1981, between 8:00 p.m. and 9:00 p.m., Floyd told her that he was going to pick up Harry because Harry had telephoned and said that his car was stalled. According to Kathleen, Harry drove a “bluish green” station wagon with “wood-grained sides.” Kathleen stated that after she spoke with Floyd, she finished her homework and went to bed.
 

 Kathleen further testified that after the police came to the house on the morning of February 18, 1981, her mother, Louise, was crying and confessed to Kathleen that Harry had shot and killed Floyd. Louise also allegedly stated that Harry had killed Floyd because Floyd had previously beaten Louise so severely that she had to be hospitalized. In addition, Kathleen testified that when Floyd’s truck was returned, Louise reenacted the murder with Kathleen while they sat in the truck.
 

 Kathleen also stated that Harry, Esther Belvill (Harry’s wife and Louise’s mother), Louise and Kathleen met at Harry’s trailer one afternoon after Floyd’s disappearance to get their “stories straight.” According to Kathleen, Louise told Harry at this meeting that he would get part of the insurance money. In addition, Louise allegedly instructed Kathleen to tell authorities that on the night of February 17, 1981, Kathleen had been on the telephone with her ex-boyfriend, David Gengler, and that Louise had been sick in bed. Kathleen went along with this assertedly fabricated account of events until January 24, 1984, just prior to the second trial. At the second trial, Kathleen testified that on February 17, 1981, she had gone to bed between 8:00 p.m. and 9:00 p.m. and that she did not remember anyone calling the house in the evening after Floyd left.
 

 At trial, Kathleen’s credibility was impeached by David Gengler’s mother, who testified that on February 17, 1981, David Gengler was indeed on the telephone with Kathleen from 7:30
 
 *981
 
 p.m. until 11:00 p.m. In addition, the defense introduced evidence that prior to the time that Kathleen changed her story, she had read the grand jury transcript and the autopsy report. These documents revealed some of the information about which Kathleen testified, and the defense asserted that these documents influenced Kathleen’s testimony. The defense also disclosed that Kathleen had been suspended from high school in 1983 for suspected consumption of alcohol. At the time of the trial, Kathleen lived with foster parents.
 

 Nell Lindler, Louise’s next-door neighbor, also testified at trial. Lindler observed Floyd’s truck leave the Callier residence at approximately 10:00 p.m. on February 17, 1981. When the police returned Floyd’s truck after Floyd’s disappearance, Lindler suggested to Louise that the police had dusted it for fingerprints. According to Lindler, Louise responded that the police would find Louise’s fingerprints as well as those of her brother and father. While Louise and Lindler conversed, helicopters flew by; Louise allegedly stated that “[a]ll [the police] got to do is look down, and they can see his head.” In addition, Louise told Lindler that Floyd was decapitated so that he could not see to crawl out of hell and that his hands were cut off so that he could not crawl out of hell.
 
 [1]
 
 Finally, Lindler testified that Louise wanted to divorce Floyd and that both before and after Floyd’s disappearance, Louise stated that she would use the insurance money to brick the house.
 

 Another witness for the state testified that Ralph Mann, a man with whom Louise was involved after Floyd’s death, wore a ring that Mann had allegedly gotten from Louise’s house in mid-1983. Kathleen testified that the ring worn by Mann was similar to the ring that Floyd had always worn. Several other witnesses, all of whom were well acquainted with Floyd, also testified that the ring was Floyd’s ring. Louise, however, testified that the rings were different.
 

 Robert Belvill (“Robert”), Louise’s brother and Harry’s son, testified that on Saturday, February 7, 1981, he visited Harry in Las Vegas. Robert stated that he tuned the green or blue Country Squire station wagon that Harry drove by putting in new plugs and points. According to Robert, while he and Harry drove the car, Harry informed him that he was going to hit Floyd in the head with a blackjack and burn Floyd’s truck and that in exchange, Louise was going to give him a portion of the insurance money. In addition, Robert testified that Harry solicited him to drive out and pick up Harry as part of the plan but that Robert
 
 *982
 
 refused to do this. Robert also testified that as he pushed Harry’s station wagon, he cracked its rear taillight.
 

 The defense presented Thomas Pearson, Harry’s son-in-law and the green Country Squire station wagon’s owner. Pearson testified that he gave Harry the station wagon in November, 1980, because Harry was interested in purchasing it. According to Pearson, he visited Harry’s residence on February 13, 1981, after learning that the wagon had been in an accident, but he did not notice a broken taillight. In addition, Pearson opined that the car did not have points that needed tuning because it had an electronic ignition system.
 

 Paul Belvill (“Paul”), another one of Harry’s sons (and Louise’s brother) testified that he had driven Harry’s green station wagon in January 1981 and that it had been involved in an accident. According to Paul, however, the rear of the wagon was not damaged. Another of Harry’s sons, Larry Belvill (“Larry”), who resided in Colorado, also testified at trial. Larry testified that Harry drove the station wagon to Colorado on March 1, 1981, and that in May 1981, they transferred the engine from Harry’s station wagon into Harry’s pickup truck, which was also in Colorado. Larry believed that Harry’s station wagon was sold to a junk dealer. In addition, Larry testified that he removed the undamaged taillight lenses and other parts from Harry’s wagon before it was junked and stored them in the luggage compartment of his own station wagon. An August 1981 search of Larry’s station wagon in Colorado, however, revealed that it did not contain spare taillight lenses.
 

 Harry told the police that he and Floyd had shredded the green station wagon in January 1981. At trial, the state introduced two receipts dated February 27, 1981, from Luria Brothers Nevada Recycling (the sole automobile scrapping company in Clark County at the time). These receipts indicated that Luria Brothers received light metal on that date. The state’s handwriting expert testified that Louise signed the name “Belvill” on these two receipts.
 

 Esther Belvill, Harry’s wife and Louise’s mother, testified that Harry was involved in salvage work in 1981. In addition, Paul Belvill testified that he signed the receipts for the scrap metal, and that he collected salvageable material from the desert and delivered it to Luria Brothers Nevada Recycling on numerous occasions. The recycling company, however, had no other receipts under “Belvill” or “Callier” in early 1981.
 

 During a search of Larry Belvill’s Colorado apartment (where Harry had been living), police discovered a letter, postmarked August 1981, from Louise to Esther. This letter stated, in pertinent part:
 

 
 *983
 
 Remember our story. Floyd and Dad cut the car up and took it either to the shreaders [sic] or sold parts of the car. The transmiss [sic] went out on it and the rear end went [sic] started making noise. This way they don’t have two different storys [sic]. Also there was no rear Damage to the car.
 

 On April 3, 1984, Louise and Harry were convicted by a jury of first degree murder with the use of a deadly weapon, and each of them received two consecutive life sentences without the possibility of parole.
 
 [2]
 
 The district court entered its judgment of conviction on September 10, 1984. On May 1, 1986, this court dismissed Louise’s direct appeal. Callier v. State, Docket No. 15854 (Order Dismissing Appeal, May 1, 1986). Louise never filed a petition for post-conviction relief pursuant to the provisions of NRS Chapter 177 then in effect.
 

 On April 1, 1986, Kathleen, Louise’s daughter, wrote a letter “to whom this may concern” in which she stated that she wished to withdraw her testimony at trial and that she had not been coerced or threatened with regard to this recantation. According to Kathleen, when she testified against her mother, she did not understand what was involved. Kathleen stated that she had read the grand jury transcripts numerous times and became convinced of her mother’s guilt. In addition, she stated that she had built up frustration against her mother and that her testimony was a means to release this frustration. Kathleen also denied recalling any conversations with Harry Belvill about Floyd’s murder.
 

 On September 11, 1986, Kathleen handwrote a series of questions and answers regarding her recantation. These questions were prepared by Harry Belvill in prison. In her answers, Kathleen stated that the prosecutor helped her with her pretrial statement, that she had the grand jury indictments in her possession for an extended period, that a juror had comforted her at trial, that she had lied at trial, that the prosecutor did not ask her to lie, that her psychiatrist pressured her to give a statement, that on the night of Floyd’s disappearance, she was on the telephone for several hours, and that on this same night, an unidentified man had called and threatened her and Louise.
 

 On October 16, 1986, Kathleen signed a document entitled “Affidavit of Kathleen Hughes.” This affidavit was prepared by an inmate friend of Harry Belvill’s at the Nevada State Prison and was then sent to Kathleen. Kathleen made corrections, signed the document before a notary public, and returned it to the prison. In this document, Kathleen stated that she gave “false and perjured testimony” against Louise and Harry. According to Kathleen, she did not intentionally provide the prosecution with false testimony,
 
 *984
 
 but testified falsely because she was very young and impressionable and had read the grand jury transcripts numerous times. Kathleen also stated that at the time of her mother’s arrest, she had been placed in foster care, had been consuming large quantities of alcohol, and “remained in a drunken condition as much of the time as possible.” Further, according to Kathleen, her psychiatrist and her foster mother pressured her to go to the district attorney, and, at the time, she believed that she was going crazy. Kathleen also stated that during her prolonged interview with the prosecutor, she “became so confused that she could no longer distinguish fact from fiction.” Kathleen stated that the prosecutor knew that her trial statements were false and that he had told her that she should lie. Finally, Kathleen explained that during a recess at trial, a juror approached her and stated that she was “doing very good, keep it up, everything will work out, watch and see, hang in there, we know they are guilty.”
 

 On November 4, 1986, Kathleen executed a second affidavit, which is quite similar to her first, in which she stated that she lied at trial. Thereafter, on May 10, 1988, Richard Brand, a licensed investigator, interviewed Kathleen. During this interview, Kathleen stated that the prosecution did not threaten her but did tell her that her trial testimony should be consistent with her previous statement, which was prepared by the prosecutor and which she had signed. According to Kathleen, she was informed of the state’s theory of the case, and the prosecutor put words in her mouth.
 

 Finally, on April 6, 1989, Kathleen signed a document entitled “Withdrawing of Deposion [sic].” In this document, Kathleen explained that she was made to feel guilty for putting her mother and grandfather in jail. She stated that “all that I have been put through and have been subject to in the past couple of years, I do not feel that I am able to give a true deposition or statement that would be true to the fact of what happened.”
 

 On December 10, 1984, Robert Belvill (Harry’s son and Louise’s brother) wrote a letter recanting his trial testimony. In this letter, Robert stated that he lied to the grand jury and at trial. According to Robert, he made up his version of events while incarcerated in Oregon and thought that if he provided the police with information about Floyd’s murder, he would be released. Robert also wrote that his statement was based on information he received from friends in Las Vegas. In addition, Robert stated that the prosecutor told him what to say at trial, told him not to testify freely, and promised him that he could get out of jail if he “did everything right.”
 

 In another (undated) letter, Robert stated that he lied at trial so that he could get out of jail and also because he thought that
 
 *985
 
 Harry and Louise should pay his bond and get him out of jail, but they did not. Robert added that he was afraid that he would “never leave town alive” if he “didn’t do right in Court.”
 

 On August 21, 1986, Robert signed an affidavit which reiterated the statements in his letters. This affidavit was prepared by Harry Belvill’s same inmate friend. Thereafter, on September 14, 1990, Robert participated in a taped interview with Richard Brand, the investigator. During this interview, Robert stated that prior to his grand jury testimony, the prosecutors told him how to testify. In addition, Robert stated that on the day of trial, he had been drinking, had taken Quaaludes, and was told what to say by the prosecutor. According to Robert, the prosecutor threatened to lock him up and forget him if he did not testify the way that the prosecutor wanted him to testify. Robert also stated that he lied at trial and that he was recanting because he has AIDS and wants to “clean his slate.”
 

 On March 15, 1989, pursuant to NRS Chapter 34, Louise filed a post-conviction petition for a writ of habeas corpus in the First Judicial District Court. On July 27, 1989, the state filed an answer to Louise’s petition, in which it asserted, among other things, that her petition was not properly before the court because she had not first filed a petition for post-conviction relief pursuant to former NRS Chapter 177.
 

 On July 28, 1989, the district court held an evidentiary hearing regarding Louise’s petition. At the hearing, Louise called Kathleen and Robert as witnesses. While on the stand, each of these witnesses was advised of the right not to testify under the Fifth Amendment and was informed that testimony regarding prior false testimony could result in a perjury prosecution. After consulting with counsel, both Kathleen and Robert refused to testify. As a result, the hearing was continued.
 

 On December 4, 1989, the evidentiary hearing resumed. At this session, Kathleen’s ex-husband testified that Kathleen had previously stated that she wanted to recant her trial testimony. In addition, he identified Kathleen’s signature on the various documents pertaining to her recantation and testified that Kathleen has a tendency to lie. Louise’s fiance also testified at the hearing. He stated that during conversations with Robert, Robert expressed a desire to recant his testimony if Louise’s fiance would take care of Robert’s wife and children financially.
 

 Robin Hughes, Louise’s son and Kathleen’s brother, testified that he had spoken with Kathleen on numerous occasions since the trial and that she had indicated to him that she had given false testimony at the trial. He also testified that on the night of Floyd’s disappearance, Kathleen was on the telephone with her boyfriend, David Gengler, for a long time and that she had given
 
 *986
 
 their mother pain medication that made their mother sleep. Finally, he stated that at Louise’s second trial, he saw a juror approach Kathleen, give Kathleen a hug, and say something to her.
 

 The state’s investigative officers, Karen Good and Michael Brady, testified that when they first interviewed Kathleen, she stated that she had no information regarding Floyd’s disappearance and death. Detective Brady further testified that before the first trial, Kathleen called him several times and yelled at him because he was “persecuting her mother.”
 

 James Wessel, Louise’s former post-conviction attorney, also testified at the hearing. According to him, he spoke with Kathleen on several occasions and discussed her affidavits with her. Kathleen informed him that she had lied at trial because she had been abusing drugs and alcohol and felt pressured by police agencies in Las Vegas. In addition, Kathleen told him that she had lied because her foster mother had manipulated her. In addition, Wessel testified that he had spoken with Robert approximately four to six times and that Robert had stated that he had lied at trial. According to Wessel, Robert felt that if he did not cooperate with authorities, he would be arrested and indefinitely detained.
 

 The deposition testimony of Paul Belvill (Harry’s son and Louise’s brother) was also produced at the hearing. According to Paul, Robert has stated that he lied at trial to stay out of jail. In addition, Larry Belvill, the son who lived in Colorado, testified at the hearing that Robert had admitted that he lied at the trial.
 

 Louise also introduced the deposition of her mother, Esther Belvill, who stated that on the night of Floyd’s disappearance, she tried to call Floyd from about 8:00 p.m. until 11:00 p.m. but that the line was busy. According to Esther, she later learned that Kathleen had been on the telephone with her boyfriend during this time. Esther also stated that Robert had told her that he lied at trial because the police or prosecutor had threatened to put him in jail for something if he did not testify and because every time the police brought him to Las Vegas, they kept him in jail without bail until he made statements.
 

 Finally, Louise presented the deposition of Helen Basler, a juror at Louise’s trial. Helen Basler testified that another juror (also named Helen) had personal contact with Kathleen at the trial. Specifically, Basler stated that at a recess during Kathleen’s testimony, Kathleen was crying, and this juror put her arm around Kathleen and comforted her. Basler did not know what was said but stated that the interaction lasted “just a few minutes.” In addition, Basler did not know if any of the other jurors saw this contact, but she did state that Louise’s mother (Esther) had seen the incident. After the trial, Basler ran into Esther, and
 
 *987
 
 Esther instructed Basler to write a letter, in part explaining about the improper contact between Kathleen and the other juror. After Basler wrote this letter, Esther and two of Louise’s other family members took Basler to get the letter notarized.
 

 On November 19, 1990, Louise filed a document with the district court entitled “Petitioner’s Opening Brief.” In this brief, Louise asserted that she was denied a fair trial because Kathleen and Robert have recanted their trial testimony and because a juror made improper contact with Kathleen at trial. In response, the state again asserted that Louise’s habeas petition was procedurally barred because she had not first filed a timely petition for post-conviction relief. In addition, the state argued that the post-trial recantations of Kathleen and Robert were incredible and unreliable and further argued that the alleged juror misconduct did not warrant a new trial.
 

 On August 23, 1991, the district court entered an order denying Louise’s petition for a writ of habeas corpus. In its order, the court determined that “the direct evidence against [Louise] in this murder is significant.” In particular, the district court noted that Louise and a friend had found Floyd’s head after being informed that she would not be able to collect on the insurance without more compelling evidence of his death. In addition, the district court pointed out that Louise’s subsequent companion wore the same distinctive ring that Floyd had always worn. Further, the district court recognized that independent evidence linked Louise to Harry and Harry to the murder.
 

 With regard to the recanted testimony, the court concluded that Robert was lying:
 

 After hearing testimony at the post-conviction hearing, and examining the record before the Court, it is clear that Robert Belvill is a liar. The Court does not accept his testimony that he lied previously and made up his evidence at trial. He testified at trial, and his credibility was fairly tested at the time by cross-examination. If the jury chose to believe or disbelieve him at that time, that was within their province.
 

 Although the court noted that it did not have “the opportunity to independently evaluate [Kathleen’s] credibility,” it concluded that her written statements, seeking to establish recantation, made “several factual assertions which . . . are false.” The court also recognized that Kathleen’s family had placed a great deal of pressure on her to change her testimony so that her mother would be released from prison. Additionally, the court determined that Kathleen’s trial testimony was consistent with the testimony of other witnesses and the physical evidence.
 

 The court determined that Louise’s claim of juror misconduct was procedurally barred because Louise was aware of the juror’s
 
 *988
 
 alleged misconduct at trial but failed to bring it to the court’s attention during trial or to this court’s attention in her direct appeal or in a post-conviction petition. The court also concluded that even if a juror had comforted Kathleen during the trial, there was no evidence that this act had any effect on the jury’s deliberations.
 

 DISCUSSION
 

 Witness recantations
 

 Louise asserts that the district court erred in denying her habeas petition and refusing to grant a new trial. She argues that because Kathleen and Robert recanted their trial testimony, her petition should be granted. The state, in turn, contends that the district court properly denied Louise’s petition because Kathleen’s and Robert’s recantations were not credible. We conclude that the district court properly rejected the recantations and did not abuse its discretion in denying Louise’s petition on this basis.
 

 In Sanborn v. State, 107 Nev. 399, 406, 812 P.2d 1279, 1284-85 (1991), we reiterated the general standard for a new trial based on newly discovered evidence as follows: (1) the evidence must be newly discovered; (2) it must be material to the defense; (3) it could not have been discovered and produced for trial even with the exercise of reasonable diligence; (4) it must not be cumulative; (5) it must indicate that a different result is probable on retrial; (6) it must not simply be an attempt to contradict or discredit a former witness; and (7) it must be the best evidence the case admits.
 

 Although we have formulated a general standard to be used in assessing motions for a new trial based on newly discovered evidence, we have not yet articulated the precise standard under which witness recantations, either in the context of new trial motion or in a habeas petition, should be assessed. Appellant urges us, in recantation cases, to deviate from the general “newly discovered evidence” standard and to adopt the standard set forth in Larrison v. United States, 24 F.2d 82, 87 (5th Cir. 1928). Under this standard, a defendant should be granted a new trial based on recanted testimony if:
 
 *989
 

 Larrison,
 
 24 F.2d at 87-88. Thus, unlike the general standard, the
 
 Larrison
 
 standard requires a defendant to show that upon a new trial, an acquittal
 
 might
 
 result, not that an acquittal will
 
 probably
 
 result. A majority of circuits and several states have embraced the
 
 Larrison
 
 standard in recantation cases.
 
 See
 
 United States v. Krasney, 607 F.2d 840, 843 (9th Cir. 1979) (recognizing the jurisdictions following
 
 Larrison), cert. denied,
 
 445 U.S. 942 (1980).
 

 
 *988
 
 (1) The court is reasonably well satisfied that the testimony given by a material witness is false.
 

 (2) That without it, the jury
 
 might
 
 have reached a different conclusion.
 

 (3) That the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial.
 

 
 *989
 
 The
 
 Larrison
 
 standard, however, has not always been applied in such cases. In
 
 Krasney,
 
 for instance, the Ninth Circuit noted that the
 
 Larrison
 
 standard had been criticized as requiring reversal in almost all cases of perjury, no matter how incidental the allegedly perjured statement.
 
 Krasney,
 
 607 F.2d at 843-44. Thus, the Ninth Circuit concluded that the general “probable acquittal” standard utilized in most newly discovered evidence cases should apply in perjury cases, at least when the government did not knowingly or negligently use the perjured testimony at trial.
 
 Id.
 
 at 844-45.
 

 We agree with the Ninth Circuit that the “probable acquittal” standard articulated in our test for newly discovered evidence should be used in recantation situations, whether in the context of a new trial motion or a post-conviction petition for a writ of habeas corpus. This conclusion is consistent with our previous cases dealing with recantation.
 
 See, e.g.,
 
 Biondi v. State, 101 Nev. 252, 256-57, 699 P.2d 1062, 1065 (1985) (concluding that, with regard to a new trial based on recanted testimony, the issue is whether the recantation is evidence that would probably alter the trial result); Riley v. State, 93 Nev. 461, 462, 567 P.2d 475, 476 (1977) (concluding that “a conviction obtained by the knowing use of perjured testimony is fundamentally unfair and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury”).
 

 We also conclude, however, that the general “new trial” standard does not adequately emphasize the need for a finding that the recanting witness’ trial testimony was false. Numerous courts have determined that recantations should be viewed with suspicion and that before granting a new trial, the trial court must be satisfied that the witness’ trial testimony was false.
 
 See, e.g.,
 
 United States ex rel. Sostre v. Festa, 513 F.2d 1313, 1318 (2d Cir.) (noting that traditionally, recantation of trial testimony is viewed with suspicion),
 
 cert. denied,
 
 423 U.S. 841 (1975); State v. Frank, 298 N.W.2d 324, 329 (Iowa 1980) (recognizing that a court should look upon witnesses’ recantations with suspicion and concluding that a new trial should not be granted unless the trial court is satisfied that the testimony of a material witness was false or mistaken); State v. White, 405 P.2d 761, 771 (Mont. 1965) (concluding that where it appears that witness’ recantation
 
 *990
 
 is motivated by family pressure, recantation is not credible),
 
 cert. denied,
 
 384 U.S. 1023 (1966); State v. Britt, 360 S.E.2d 660, 665 (N.C. 1987) (concluding that in considering witness recantations, the trial court must first be reasonably well satisfied that the testimony of material witnesses was false).
 

 A finding that the trial testimony was indeed false is essential in evaluating alleged perjury cases, and the trial court should first address this issue. In addition, the trial court must determine whether the evidence exposing the trial testimony as false was recently discovered and whether this evidence was available at trial through reasonable diligence. Finally, the trial court must determine whether the outcome at trial would probably have been different had the perjured testimony not been introduced at trial. In other words, in evaluating recantation cases, whether in the context of a new trial motion or a habeas petition, the trial court should apply the following standard:
 

 (1) the court is satisfied that the trial testimony of material witnesses was false;
 

 (2) the evidence showing that false testimony was introduced at trial is newly discovered;
 

 (3) the evidence could not have been discovered and produced for trial even with the exercise of reasonable diligence; and
 

 (4) it is probable that had the false testimony not been admitted, a different result would have occurred at trial.
 

 Only if each component is met should the trial court order a new trial.
 

 In the present case, the district court was
 
 not
 
 reasonably well satisfied that the trial testimony of Kathleen and Robert was false. Instead, the court concluded that their recantations were not credible. In particular, the court properly found that other evidence adduced at trial was consistent with the trial testimony of Kathleen and Robert, thus suggesting that their trial testimony was truthful. In addition, the court determined that Robert’s recantations were incredible and that Kathleen’s recantations contained false statements. This determination is supported by the record. Robert gave inconsistent recanting statements and made bald allegations of extraordinary prosecutorial misconduct. Kathleen’s recantations were also inconsistent—in some of her writings, she stated that she did not intend to lie, and in others, she stated that she was instructed by the prosecutor to lie. Moreover, the court’s conclusion that Kathleen’s family had placed a
 
 *991
 
 great deal of pressure on her to recant is directly supported by Kathleen’s statements in her “Withdrawing of Deposion [sic].”
 

 Finally, the district court considered significant Kathleen’s and Robert’s refusal to testify at the hearing. The district court appropriately considered these witnesses’ refusal to testify under oath and subject themselves to cross-examination in concluding that their recantations were not credible.
 
 [3]
 

 See
 
 State v. Landon, 848 P.2d 724 (Wash. Ct. App. 1993) (concluding that an out-of-court recantation is not a sufficient basis for a new trial).
 

 In short, we conclude that the district court’s findings regarding the credibility of the recantations are supported by the record and that Louise has not demonstrated that the district court abused its discretion in denying her petition on this basis. In addition, as the district court was not reasonably well satisfied that the witnesses’ trial testimony was false, it did not need to consider any of the other factors regarding witness recantations.
 

 Alleged juror misconduct
 

 Louise maintains that the district court erred in concluding that her claim of juror misconduct is procedurally barred. We conclude, however, that the district court properly denied her claim
 
 *992
 
 on this basis. Unlike her claim that Kathleen and Robert had recently recanted their trial testimony, Louise’s claim of juror misconduct was based on information that was available to her either during or directly after the trial. Specifically, Louise’s mother, Esther, observed the alleged misconduct, and confronted another juror about it. In addition, Esther and other family members took this juror to have her letter signed by a notary public.
 

 At the time that Louise filed her habeas petition, NRS 34.725 provided as follows:
 

 A petitioner may not file a petition for writ of habeas corpus unless he previously filed a petition for post-conviction relief pursuant to NRS 177.315 to 177.385, inclusive, or demonstrates good cause for the failure to file a petition for post-conviction relief or meet the time requirements for filing a petition for post-conviction relief and actual prejudice to the petitioner.
 

 Thus, as information regarding the alleged juror misconduct was available to Louise directly after, and possibly during the trial, Louise was required to demonstrate good cause for her failure to file a petition for post-conviction relief, as well as actual prejudice.
 
 [4]
 
 Additionally, the state, in its answer to Louise’s habeas petition, urged the district court to dismiss the petition on the ground that Louise had not previously filed a petition for post-conviction relief. Thus, contrary to Louise’s assertion, the state did not waive its argument that the habeas petition was procedurally barred, and Louise had notice that she needed to establish cause and prejudice.
 

 Passanisi v. Director, Department of Prisons, 105 Nev. 63, 769 P.2d 72 (1989), presented this court with a situation analogous to that presented in this appeal. In
 
 Passanisi,
 
 a prisoner failed to file a petition for post-conviction relief and instead filed a petition for a writ of habeas corpus on the day before the cutoff for his petition for post-conviction relief. We concluded that “a petitioner . . . who has not previously filed a petition for post-conviction relief must demonstrate good cause for his failure to file a timely petition for post-conviction relief
 
 and
 
 he must demonstrate actual prejudice in order to be eligible to file a petition for a writ of habeas corpus.”
 
 Id.
 
 at 65, 769 P.2d at 74.
 
 *993
 
 Even though the prisoner had filed his habeas petition within the required time for filing a petition for post-conviction relief, we concluded that he could not “overcome the procedural default.”
 
 Id.
 
 at 66, 769 P.2d at 74.
 

 Based upon former NRS 34.725 and
 
 Passanisi,
 
 Louise had the burden to demonstrate good cause why she did not previously raise her claim of juror misconduct in a petition for post-conviction relief, and that she would suffer actual prejudice if the court refused to entertain this claim. As she failed to do so, her claim of juror misconduct is barred.
 

 CONCLUSION
 

 In assessing cases involving possible perjury at trial, the trial court should order a new trial only if the following criteria are met:
 

 (1) the court is satisfied that the trial testimony of material witnesses was false;
 

 (2) the evidence showing that false testimony was introduced at trial is newly discovered;
 

 (3) the evidence could not have been discovered and produced for trial even with the exercise of reasonable diligence; and
 

 (4) it is probable that had the false testimony not been admitted, a different result would have occurred at trial.
 

 Here, the district court determined that the witnesses’ recantations were not credible and properly denied appellant’s habeas petition on this basis. In addition, the district court correctly concluded that appellant’s claim of juror misconduct is procedurally barred, as she did not demonstrate good cause for her failure to raise this claim previously. We therefore affirm the district court’s order denying Louise’s post-conviction petition for a writ of habeas corpus.
 
 [5]
 

 [1]
 

 Louise testified at trial that a girl at the K-Mart had told her that this was why Floyd’s head and hands had been severed.
 

 [2]
 

 In February 1987, Harry Belvill died at the Nevada State Prison.
 

 [3]
 

 Louise contends that by advising Kathleen and Robert of their potential criminal liability for perjury, the district court violated her constitutional rights. In support of her contention, Louise cites Webb v. Texas, 409 U.S. 95 (1972), U.S. v. Morrison, 535 F.2d 223 (3d Cir. 1976), and Berg v. Morris, 483 F. Supp. 179, 182 (E.D. Cal. 1980). These cases, however, do not support Louise’s position. Each of these cases involved conduct that far exceeded that of the district court in the present case. Here, the district court simply informed the witnesses of their right not to testify and also told them that any testimony regarding prior false testimony could subject them to perjury charges. The district court had discretion to warn these witnesses of their right not to incriminate themselves.
 

 Louise also asserts that Kathleen and Robert could not be subject to perjury convictions in light of the relevant statute of limitations. The secret manner exception, however, would apply to toll the relevant statute of limitations.
 
 See
 
 NRS 171.095; Walstrom v. State, 104 Nev. 51, 752 P.2d 225 (1988) (concluding that crime is committed in secret manner when done in surreptitious manner that is intended to make others unaware that offense has been committed). If these witnesses’ allegedly perjured trial statements were not performed “secretly,” then Louise was dilatory in bringing her petition.
 

 Without citing any relevant authority, Louise further contends that Kathleen’s and Robert’s recantations would be valid defenses to any perjury charges. This contention also lacks merit. Finally, Louise argues that Kathleen and Robert should be permitted to testify with immunity from prosecution. Neither the prosecution nor the court, however, was required to grant Kathleen and Robert immunity from prosecution for perjury.
 
 See
 
 NRS 178.572; McCabe v. State, 98 Nev. 604, 606, 655 P.2d 536, 537 (1982).
 

 [4]
 

 NRS 34.725 has since been repealed, but the repeal of this section does not apply to post-conviction proceedings instituted before January 1, 1993. 1991 Nev. Stat., Ch. 44, at 92.
 

 [5]
 

 On May 9, 1994, Louise filed a motion for leave to file supplemental authorities and included with this motion a synopsis of supplemental cases regarding recanted testimony. We grant this motion and direct the clerk of this court to file these supplemental authorities. These authorities were considered in our resolution of this appeal. We deny Louise’s motion for oral argument, which was filed with this court on July 7, 1994, and which was renewed on June 27, 1995.